Charles W. GARTON, Petitioner,

v.

Harold R. SWENSON, Warden,
Respondent.

No. 18547–1.

United States District Court,
W. D. Missouri, W. D.

June 25, 1976.

David Robards, Asst. Federal Public Defender, Kansas City, Mo., for petitioner.

John C. Danforth, Atty. Gen., State of Missouri, Paul Robert Otto, Asst. Atty. Gen., Jefferson City, Mo., for respondent.

## MEMORANDUM AND ORDER GRANTING HABEAS CORPUS RELIEF

JOHN W. OLIVER, District Judge.

### I.

This is the third time this state prisoner habeas corpus case has been before this Court. In *Garton v. Swenson* (W.D.Mo. 1967), 266 F.Supp. 726, we granted federal habeas corpus relief because petitioner had been denied his right to counsel on direct appeal and because he had been denied a postconviction evidentiary hearing required by federal standards, enunciated in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), and *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963).

Seven years later, in *Garton v. Swenson* (W.D.Mo.1973), 367 F.Supp. 1355, we felt compelled to deny petitioner habeas relief in his alleged Sixth Amendment claim of ineffective assistance of counsel because "we are quite confident that should the Court of Appeals apply its 'farce or mockery' test to the circumstances of this case, it would conclude that any finding this Court may make in regard to ineffective assistance would implicitly be found to be clearly erroneous and petitioner would be denied relief on the theory that the Supreme Court of Missouri had properly articulated and applied the Eighth Circuit's 'farce and mockery' standard." [367 F.Supp. at 1364].[1]

When this case was last before this Court in 1973, the petitioner was then serving a life sentence imposed under the Missouri Habitual Criminal Act. Approximately a month after the Court of Appeals concluded that we had read the Eighth Circuit's "decisions too narrowly" and had therefore remanded this case "for an evidentiary hearing wherein the district court shall determine whether Garton's attorneys conducted an inadequate investigation which amounted to ineffective assistance of counsel," see *Garton v. Swenson* (8th Cir. 1974), 497 F.2d 1137, 1140, petitioner was released on parole.[2]

The Federal Public Defender who had been appointed to represent petitioner both in this Court and in the Court of Appeals did not hear from petitioner until January, 1975. Inquiry developed that petitioner,

---

1. We fully recognized that "application of the 'farce and mockery' rule in this, or, for that matter, in almost any other case, implicitly requires a denial of petitioner's Sixth Amendment ineffective assistance of counsel claim without further factual inquiry," [367 F.Supp. at 1360] but explained our reluctant conclusion as we have above stated in the text.

2. *Peyton v. Rowe*, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); *Carafas v. LaVallee*, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); *Jones v. Cunningham*, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), all approved most recently in *Hensley v. Municipal Court*, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973), establish that although on parole, petitioner is

because of conditions of health, would have been satisfied with being relieved of his obligations of parole. The Attorney General's office agreed that application should be made to the Missouri Board of Parole and Probation for its consideration of whether it would recommend commutation of sentence to the Governor in order that this case, as a practical matter, would be mooted.

The Assistant Attorney General in charge of the case thereafter reported that the Board of Parole and Probation wanted to review available medical data. The Board was furnished that data as it related to petitioner's recent open-heart surgery performed at the University of Missouri Medical Center and a more recent and current report of petitioner's physician in Odessa, Texas, where petitioner is presently living.

The Missouri Board of Parole and Probation finally determined, on January 23, 1976, however, that it would not make any exception to what it stated was a long-established policy of requiring a minimum period of five years supervision before considering recommendation to the Governor for commutation of a life sentence. On March 2, 1976 the Assistant Attorney General advised this Court that the Board of Parole and Probation would not reconsider its position.

Counsel were agreed that the Court of Appeals' remand for an evidentiary hearing to "determine whether Garton's attorneys conducted an inadequate investigation which amounted to ineffective assistance of counsel" must be read in light of the Court of Appeals' quotation of this Court's opinion in which we outlined the type of hearing this Court would have conducted had it been free to do so.

As we attempted to explain, we did not believe that we could properly conduct such

a hearing in the face of the Supreme Court of Missouri's application of the Eighth Circuit's "farce and mockery" rule, as stated in *Cardarella v. United States* (8 Cir. 1967), 375 F.2d 222, 230, in a manner in which we believed our Court of Appeals had consistently applied that rule over the years.

After noting that "there is nothing in the record to show that counsel was familiar with the provisions of § 491.420, V.A.M.S., whereby out-of-state witnesses could have been subpoenaed" and that "§ 491.420, V.A.M.S., provides for the compulsory attendance of out-of-state witnesses," the Court of Appeals quoted the following portion of this Court's opinion:

> If we were free to apply any standard other than the "farce and mockery" rule, we would, as we have indicated, deem it necessary to conduct a further evidentiary hearing to ascertain whether defendant's counsel or anyone else involved in the case, were familiar with the fact that all of the witnesses who testified at the two extradition hearings in New Mexico could have been compelled to testify in Missouri pursuant to V.A.M.S. § 491.420, Missouri's version of the Uniform Law to Secure Attendance of Witnesses from Within or Without the State in Criminal Proceedings. Judicial notice requires recognition of the fact that New Mexico has also adopted the Uniform Act.
>
> We would also make further inquiry into the circumstances surrounding the refusal of the trial court to grant a continuance. [497 F.2d 1139] [3]

When it became apparent in March of this year that the Board of Parole and Probation was not going to take any administrative action to moot this case, counsel advised the Court that they were confident that they would be able to stipulate the material and relevant factual circumstances relating to the questions presented by the

---

still in "custody" within the meaning of the federal habeas corpus statute and that the case was not mooted by the State's grant of parole.

**3.** The Court of Appeals also noted that petitioner in the Court of Appeals, as did petitioner when last in this Court, "argues that failure to take the proper steps to procure these alibi

witnesses amounts to inadequate investigation and preparation." [497 F.2d at 1139] Counsel are agreed that the Court of Appeals opinion and its order of remand make clear that this Court is now free to give appropriate consideration to that argument.

Court of Appeals' order of remand. The following stipulation was filed March 29, 1976:

COME NOW the petitioner and the respondent and hereby agree and stipulate that if Mr. Commodore M. Combs, Jr., were called as a witness at an evidentiary hearing in this case to supplement the testimony he gave on February 18, 1969 in the case of *Charles W. Garton v. State of Missouri*, No. E–13572, in the Circuit Court of Andrew County, Missouri, he would state as follows:

That Combs cannot recall whether he and Harrington ever discussed the possibility of subpoenaing Garton's alibi witnesses in New Mexico to testify in Missouri.

That Combs and Harrington did not pay the expenses of Garton's wife and Tommie Louise Lee Owen for the trip from New Mexico to Missouri.

That, however, Harrington did provide Tommie Louise Lee Owen with expense money for the trip back to New Mexico.

That Combs does not recall ever having utilized Missouri's out-of-state subpoena statute, Mo.Rev.Stat. Section 491.420 (1969) (enacted in 1959), and would have to say that he was unaware of the statute at the time of the Garton trial.

That Combs does not know if Harrington knew of that statute at that time or if Harrington had ever used that statute before or afterwards.

That Combs cannot recall whether an oral motion for a continuance was made at the beginning of the Garton trial and, if such a motion was made, cannot remember any of the circumstances surrounding it.

That the statements contained herein are true and correct to the best of Combs' knowledge and recollection.

Petitioner and respondent also hereby agree and stipulate that neither of them have additional evidence he wishes to adduce, and that the case may be considered on the basis of the data already in the files and records, together with the above stipulation to Mr. Combs' testimony.

Both sides thereafter filed proposed findings of fact and proposed conclusions of law. Both sides have suggested that we reiterate as an introductory finding the same finding we made when the case was last here. Accordingly, we again find that on September 1, 1961, two men robbed the Farley State Bank in Farley, Missouri. Petitioner was arrested for that crime on October 28, 1961 in Hobbs, New Mexico, and was held for extradition to Missouri. At an extradition hearing held November 22, 1961, the District Court of Lea County, New Mexico, after hearing four witnesses testify as to petitioner's presence in Hobbs on the date of the robbery, released him and refused extradition. Later, on January 5, 1962, a second extradition hearing was held at which the State presented three eye-witnesses to the robbery who identified petitioner as one of the participants. The same four alibi witnesses again testified for the petitioner, but extradition was granted.

None of the remaining findings proposed by the parties are in such complete and total agreement. However, the findings proposed by each side do not present any substantial conflict in the underlying factual circumstances of this case. Generally speaking, the parties disagree only in regard to what inferences should be drawn from the undisputed factual circumstances. We shall therefore state our findings in language proposed by the parties, making such modifications as we believe are required by the record, and shall draw the inferences we are convinced must be drawn from the virtually undisputed circumstances of the case.

The four alibi witnesses mentioned above were Mr. R. E. Holliday, Mr. R. E. Jones, Mr. Jack Lewis, and Mr. A. W. Rash. None of those four witnesses testified at petitioner's state trial. On May 25, 1971, as a part

of federal habeas corpus discovery, the depositions of those witnesses, with the exception of Rash who had died, were taken and filed as part of the record in this case. Had the four witnesses been subpoenaed and called to testify at the petitioner's state trial and had they testified as they did at the two earlier extradition hearings and in their depositions, their trial testimony would have been helpful to the petitioner in that such testimony would have substantially supported the petitioner's alibi defense in that such testimony would have placed the petitioner in Hobbs, New Mexico on August 31 and September 1, 1961, rather than at the site of the bank robbery in Farley, Missouri.

The four alibi witnesses were not subpoenaed to appear and testify at the petitioner's state trial, although his trial counsel, Mr. Joseph Harrington, now deceased, and Mr. Commodore M. Combs, Jr., whose testimony is stipulated, both knew of the witnesses and considered their testimony "very vital to the defense" of the petitioner [Trial Tr. at 4]. The record demonstrates that it was not a decision of defense tactics or trial strategy not to put on the testimony of the four aforementioned alibi witnesses. [See Trial Tr. at 4–6]. In fact, the defense asserted at trial by the petitioner through his counsel was the defense of alibi [Trial Tr. at 336–359].

The State concedes that Roe Holliday testified by way of federal habeas deposition that if he had been called as a trial witness, he would have placed petitioner in Hobbs, New Mexico, on September 1, 1961, by way of recalling actually having seen petitioner there on that date. If he had testified at trial, his testimony would have been that he saw petitioner at the Wayside Inn, where Holliday worked, when petitioner arrived there between 10:30 and 11:00 p. m. [Dep. Tr. 21–24]. R. E. Jones testified by way of federal habeas deposition that petitioner was his employee at the Mirror Room in Hobbs, New Mexico, during August and September, 1961. While his testimony at trial would have been that he did not know the exact location of petitioner on September 1, 1961, and that petitioner could have been gone for several days around that time and may not have been noticed [Dep. Tr. 71, 73], Jones' testimony would have corroborated the fact of petitioner's employment in Hobbs, New Mexico and, when taken with the testimony of the other alibi witnesses, would have been helpful to the defendant. Deposition testimony taken of Jack Lewis showed that he would have testified at petitioner's trial that while he had not seen petitioner on the date of the bank robbery, September 1, 1961 [Dep. Tr. 51–52] he could place petitioner in Hobbs, New Mexico, on August 31, 1961, by referring to the date on a receipt [Dep. Tr. 64]. Mr. Rash had been stricken with a heart attack at the time of petitioner's state trial [27.26 Tr. 158 and Dep. Tr. 54] and was dead at the time the federal habeas corpus depositions were taken on May 25, 1971.

The four aforementioned alibi witnesses all resided in the State of New Mexico. At the time of petitioner's state trial, there existed a state statutory procedure for summoning witnesses from another state to testify in Missouri. Mo.Rev.Stat. Section 491.-420 (1969) (enacted in 1959). It is clear from the record that defense counsel made no attempt to utilize that statute to summon the four alibi witnesses to testify at petitioner's trial. Mr. Combs, the only survivor of the two defense counsel, has stated in stipulated testimony that he was unaware of Section 491.420 at the time of petitioner's trial. [Stipulation filed March 29, 1976] Although Mr. Combs did not know whether Mr. Harrington was aware of that statute at the time of the trial, the inferences which must be drawn from Combs' stipulated testimony and all of the circumstances of the case, all establish beyond reasonable doubt, Mr. Harrington's lack of familiarity with Section 491.420. We expressly reject the State's proposed finding that the alibi witnesses were absent from petitioner's trial as a result of illness or accident and not as a result of a lack of subpoena from petitioner's trial attorneys.

We make the determinative findings in the preceding paragraph in full recognition

of our Court of Appeals' statement in *Garton* that it has never used the words "mockery of justice" in any "talismanic" sense, but that State and district court judges in the Eighth Circuit are to understand that the Eighth Circuit has in the past and now employs those words "to encompass the principle that a petitioner or appellant bears the heavy burden of proving unfairness." [497 F.2d at 1139]

The State properly recognizes that the Court of Appeals significantly stated that "there is nothing in the record to show that counsel was familiar with the provisions of § 491.420, V.A.M.S., whereby out-of-state witnesses could have been subpoenaed." [*Id.* at 1139] Faced with the stipulated fact that Mr. Combs, with commendable frankness, conceded he did not know of the existence of § 491.420, the State suggests in regard to Mr. Harrington that "the mere fact that an attorney did not use an available procedure does not mean that he did not know about it" [State's brief, p. 10]. The State also suggests that petitioner's trial counsel "may have reasonably determined that requesting [the alibi witnesses'] appearances informally would be just as effective as issuing a subpoena" [State's brief, p. 11].

■ With commendable candor, however, the State directs attention to the examination of a defense witness at trial which reflects only one of the circumstances which establishes that, in our considered judgment, the petitioner has carried the heavy burden stated by our Court of Appeals of proving that neither Mr. Harrington nor Mr. Combs had any knowledge of § 491.420 at the time of trial. The trial examination to which the State directs attention on page 346 of the trial transcript reads as follows:

Q. Mrs. Owens, you come from Hobbs, New Mexico, to testify in this Court, how did you get here?

A. I pulled doubles last week. I worked a double shift all week long to come up here.

\* \* \* \* \* \*

Q. [By Mr. Combs] You weren't subpoenaed?

A. *I understand you can't subpoena out of state.*

\* \* \* \* \* \*

THE COURT: Are you asking the witness if she is under subpoena here?

MR. COMBS: I was about to do that.

Q. [By Mr. Combs] Are you under subpoena?

A. *They told me they couldn't subpoena out of State.* No, I am not subpoenaed here. [Emphasis ours]

■ The State also suggests that this Court may properly infer that Mr. Harrington, because he had practised criminal law for some time in Kansas City, may have had some previous occasion to research the law in regard to obtaining out-of-state witnesses and that he "might reasonably have determined that obtaining promises of their attendance would be sufficient to guarantee their presence." [State's brief, p. 10]

■ The notion that a witness could and would travel at his own expense rather than at the State's is untenable on its face, to say nothing of the risk involved in failing to have an important witness under subpoena. In regard to what research a criminal lawyer may have engaged in in the past, no experienced federal trial judge is in the least surprised to learn that any number of lawyers who try many criminal cases for years have never heard of, for example, Section 3500, Title 18, United States Code.[4] We expressly reject the State's suggestion that we draw the inferences it has proposed. Indeed, if such inferences could be drawn, we would, under the circumstances of this case, be required to make a finding that counsel's failure to use § 491.420 would

---

4. Public attention has been called to the adequacy of trial advocacy by Chief Justice Burger in his Sonnett Lecture at Fordham University in 1973, as was noted, apparently with approval, by our Court of Appeals in footnote 11 in its decision in *McQueen v. Swenson*, 498 F.2d 207, 215 (8 Cir. 1974). Chief Judge Kaufman's appointment of the Clare Commission and the proposals of that Commission in the Second Circuit reflect the concern of particular courts in regard to the general quality of legal service in those courts today.

have breached the duty owed petitioner under the Sixth Amendment.[5]

Section 491.420 is a part of the Uniform Law to Secure Attendance of Witnesses from Within or Without State in Criminal Proceedings. The Uniform Law is applicable only in those states which have adopted it. At the time of petitioner's trial, the State of New Mexico, the resident state of the four alibi witnesses, had adopted the Uniform Law. 1953 Comp. Sections 41–12–13 to 41–12–18.

Although we indicated when this case was last here that if we had believed we were free to do so we would have made further inquiry into the circumstances surrounding the refusal of the trial court to grant a continuance, it is not necessary to state the factual circumstances in that regard or to reach that substantial question because the only issue briefed by the parties is the Sixth Amendment question of whether petitioner was denied the effective assistance of counsel because of petitioner's counsels' failure to learn of and utilize § 491.420.[6]

## II.

■ The order of remand directed that this Court consider this case in light of the Court of Appeals' holding in *McQueen v. Swenson* (8 Cir. 1974), 498 F.2d 207. As we shall suggest in the appendix attached to this opinion, the question of what the holding of *McQueen* may be has not been answered in the same manner by both appellate and trial judges who have been required to make that determination. We have therefore concluded that justice will be served in connection with our compliance with the remand order of the Court of Appeals in this case by our acceptance of the view of *McQueen's* holding agreed to by both sides. Petitioner's counsel does not disagree with the State's view of *McQueen's* holding and we independently conclude that both side's view of *McQueen* is consistent with at least one of the views expressed by at least some Eighth Circuit appellate and trial judges who have been required to consider the holding of that case.

■ The State's view of *McQueen's* holding is stated on pages 8 and 9 of its brief as follows: "*McQueen* held that there is a two-step analysis approach to claims of ineffective assistance of counsel. First, petitioner must establish whether there has been a failure to perform a duty owed by the defense attorney to his client. Second,

5. Fairness to the late Mr. Harrington and to Mr. Combs requires the statement that our determination of this case is not in any way a determination that either lawyer was not or is not a competent and able lawyer with experience. *Goodwin v. Swenson* (W.D.Mo.1968), 287 F.Supp. 166, 182, points out that the question of whether trial counsel "is an able lawyer who had had previous experience in the trial of criminal cases" is *not* a relevant or material issue in the determination of a Sixth Amendment case. The narrow question always presented in such a case is whether, under the facts and circumstances of a particular case under consideration, trial counsel rendered the assistance required by the Constitution of the United States.

Mr. Harrington represented the defendant involved in the case described in the article entitled "A Judge Looks at LSD," published in *Federal Probation*, Vol. XXXII, No. 1 (March 1968) 5, which we wrote at the request of Victor H. Evjan, editor of that publication, with imagination and distinction. Mr. Combs has rendered outstanding service to many defend-

ants in cases tried before this Court. His exemplary devotion to duty was demonstrated, for example, in the case of *United States v. Allie Eugene Johnson*, No. 23441–1, eventually tried in this Court, in which he successfully obtained the release of defendant on an unsecured bond in a federal bank robbery case by assuming personal responsibility for the defendant under the provisions of the Bail Reform Act.

As we did in *Goodwin*, and as we have done in subsequent Sixth Amendment cases, we emphatically state that our determination of the particular factual circumstances of this case is not an adjudication that either the late Mr. Harrington or Mr. Combs were and are not competent, able, and experienced lawyers.

6. *United States ex rel. Drew v. Myers* (3 Cir. 1964), 327 F.2d 174, however, makes clear that petitioner's due process rights may have also been denied under the combined undisputed circumstances of this case as they relate to the *refusal of the trial court to grant a continuance* for the purpose of permitting petitioner's counsel to utilize § 491.420.

he has the burden of establishing whether that failure prejudiced him in obtaining a fair trial. If prejudice is found to exist, it can be declared harmless only if it is found to be so beyond a reasonable doubt. *McQueen* at 218, 220. Furthermore, when the claim of ineffective assistance of counsel relates to the investigation of or obtaining the presence of witnesses, the petitioner must show existence of admissible evidence which could have been presented at the trial and which would have proved 'helpful' to the defendant either on cross-examination or in his case in chief. Once petitioner has shown that his attorneys' breach of duty has caused the absence of admissible testimony which would have been 'helpful' to his case, he must be granted a new trial unless a court can hold the belief that the omission of the evidence was harmless beyond a reasonable doubt. The burden of proving prejudice is initially on petitioner unless he can show such changed circumstances as would justify placing the burden of proving an absence of prejudice on the state."

In its application of that analysis, the State conceded that "the conducting of legal research on issues essential or important to a case is a duty owed by an attorney to a client," and stated that, under that circumstance, "petitioner must show, first, that both of his trial attorneys, Combs and Harrington, were ignorant of the legal provisions for obtaining compulsory service on out-of-state witnesses as provided in § 491.-420, R.S.Mo.1969."

In regard to that first step of the State's analysis, we reiterate our factual finding that both of petitioner's trial attorneys were ignorant of § 491.420 and therefore conclude that petitioner has carried *Garton*'s heavy burden of proving that the duty which the State concedes was owed petitioner was breached under the circumstances of this case.

The State continued its application of its analysis of *McQueen* by stating that "Second, if such a lack of knowledge is shown, petitioner must show in addition that there are witnesses who had admissible testimony which would have been helpful to his case and whose failure to testify is attributable to the fact that no subpoenaes were issued for them." We reiterate our finding that the petitioner has carried the heavy burden required by *Garton* of establishing beyond reasonable doubt that the witnesses' testimony would have been helpful to his case and that the failure of those witnesses to be called as witnesses and to testify resulted from counsel's failure to know of and to utilize § 491.420.

▮ And, finally, the State stated as part of its analysis of *McQueen*'s holding that "Third, if petitioner has borne his burden of proof on the first two points, he must be granted a new trial unless the state can show that the prejudicial effect of the lack of such testimony on petitioner's trial was harmless beyond a reasonable doubt." We reiterate our finding that the petitioner has carried the heavy burden of proving unfairness in accordance with *Garton*, and conclude, in accordance with both parties' understanding of *McQueen*'s holding, that the petitioner is entitled to a new trial for the reason that the State has not shown that the prejudicial effect of the lack of the alibi witnesses' testimony was harmless beyond a reasonable doubt.

We further assume, for purposes of this opinion only, that a violation of the Sixth Amendment guarantee of effective assistance of counsel is subject to a harmless rule. Accordingly, we find and conclude, in the language of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), that the State, as the beneficiary of the constitutional error involved in this case, has not "prove[d] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [7]

---

7. It is not necessary in this case for this Court to reach and consider whether a violation of the Sixth Amendment's guarantee to the right of the effective assistance of counsel can be considered as a "harmless" error under the rationale of *Chapman*. Mr. Justice Black, author of *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), one of *Powell v. Alabama's*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), most famous progeny, stated in his

### III.

Our consideration of the case on remand in accordance with the parties' agreed reading of the Eighth Circuit's holding in *McQueen* makes it clear that petitioner is entitled to federal habeas corpus relief. An appropriate order will therefore be entered in this case.

We believe, however, that we should add that this case, once again, vividly illustrates the need for guidance from the Court of Appeals in regard to the manner State court judges and federal trial judges are to consider a Sixth Amendment ineffective assistance of counsel claim. When this case was last before us, we set forth various of the numerous rules of decision, sometimes defined in the cases as "standards," which had been articulated in various Eighth Circuit cases over the years. Those rules included, but were by no means limited to, the *Cardarella* "farce and mockery" rule. See 367 F.Supp. at 1360–1362. We noted that in a state prisoner habeas corpus case: "If different standards are articulated in various Eighth Circuit cases, the various State courts are afforded a multiple choice

as to which standard is to be applied in regard to the federal question presented."

Because one of those multiple choices included the Eighth Circuit's "farce and mockery" rule, and because the Supreme Court of Missouri had based its decision in *Garton* solely on that rule, we concluded that we were under judicial duty as a federal trial judge, regardless of what we may have thought about that rule, to approve the Supreme Court of Missouri's application of the " 'farce and mockery' rule . . . [and to] make the same application of that rule which we believe the Court of Appeals would make under the circumstances." *Id.* at 1365.

We frankly expressed our belief that the articulation and routine application of the "farce and mockery" rule by the Supreme Court of Missouri as a federal constitutional standard almost automatically required the denial of relief in all Sixth Amendment ineffective assistance cases. For, as we stated three years ago when the case was last before us, "we know of no case in the Eighth Circuit or elsewhere which has ever concluded that the 'farce and mockery' rule has ever been violated in a particular case." *Id.* at 1364.[8] Under the juridical circum-

opinion in *Chapman* that "our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." In his *Chapman* opinion, Mr. Justice Black cited "*Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (right to counsel)" as one example of such a right in footnote 8 on page 23 of 386 U.S., on page 828 of 87 S.Ct. In quite like manner, *Argersinger v. Hamlin*, 407 U.S. 25, 32–33, 92 S.Ct. 2006, 2010, 32 L.Ed.2d 530 (1972), after quoting long portions of both cases, stated that "*Powell* and *Gideon* suggest that there are certain fundamental rights applicable to all such criminal prosecutions, even those, such as *In re Oliver, supra*, where the penalty is 60 days' imprisonment: 'A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, *and to be represented by counsel.*' 333 U.S. [257], at 273 [68 S.Ct. 499, at 507, 92 L.Ed. 682] (emphasis supplied)."

See *Comment* on *McQueen*'s treatment of *Chapman* in 43 George Washington Law Review 1384 (August, 1975) entitled "Ineffective

Assistance of Counsel and the Harmless Error Rule: The Eighth Circuit Abandons *Chapman*." See also *Note* on *McQueen* in 43 Fordham Law Review 310 (1974) entitled "Criminal Law—Attorney's Lack of Pre-Trial Investigation Constitutes Ineffective Assistance of Counsel But Burden Is on Defendant to Prove Prejudice Requiring Reversal."

**8.** We suggest that the discussion of *McQueen* and its progeny in the appendix attached to this opinion underlines the impact of the choice of rule on the predictable result of a Sixth Amendment ineffective assistance of counsel case. *Thomas v. Wyrick*, 8 Cir., 535 F.2d 407, decided April 28, 1976, was considered by both the trial and appellate court as a "close" case. Close enough, indeed, that both courts recognized that application of *Cardarella*'s "farce and mockery" rule in its traditional form would command the denial of federal habeas relief for the state prisoner there involved. This case, of course, is but another example of the same thing. Application of "farce and mockery" dictated denial of relief; application of one version of *McQueen* required the granting of relief. And, in the meantime, the petitioner is in prison or constructive custody.

stances presented in *Garton*, we expressed the hope that the Eighth Circuit would reconsider the "farce and mockery" rule and, in accordance with principles stated in numerous Supreme Court decisions since *Powell v. Alabama*, [287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)] was decided in 1932, follow the lead of other Circuits and establish a single definitive Sixth Amendment standard in this difficult area of the law for the guidance of the various State court judges and the federal district judges in the Eighth Circuit.[9]

The Court of Appeals obviously did not believe that it was appropriate to reconsider the Eighth Circuit "farce and mockery" rule in *Garton*. It did, of course, take a half-way step toward a reconsideration of that rule when it decided *McQueen*. As will be developed later in detail, we believe that it is apparent that *McQueen*'s admonition that the "farce and mockery" language in the Eighth Circuit's rule should not be "taken literally" was borrowed directly from the 1967 decision of the Court of Appeals for the District of Columbia, as stated in *Bruce v. United States* (1967), 126 U.S. App.D.C. 336, 379 F.2d 113. *Bruce*, of course, was dealing with the earlier District of Columbia case, *Jones v. Huff* (1945), 80 U.S.App.D.C. 254, 152 F.2d 14, which articulated the traditional "farce and mockery" rule as it formerly existed in the District of Columbia Circuit. *Huff* stated the former District of Columbia's "farce and mockery" rule in language almost identical to that used by the Eighth Circuit in *Cardarella*.

When the District of Columbia reconsidered and rejected *Bruce*'s modification of *Jones v. Huff* in its 1973 decision in *United States v. DeCoster* (1973), 159 U.S.App.D.C. 326, 487 F.2d 1197, it recognized that the District of Columbia Circuit's opinions "leave uncertain the correct standard to be applied when the question of ineffectiveness is raised." *DeCoster* noted, however, that "several important developments since *Bruce*" required a fundamental reconsideration of *Bruce* which required, as apparently does *McQueen*, "a heavy burden" to show "unfairness" for the reason such a test suggested in *Bruce* "appears to rest on the theory that an ineffectiveness claim is grounded in the due process clause" rather than on the Sixth Amendment to the Constitution of the United States.

We are convinced that, as was true in the District of Columbia Circuit in 1973 when *Bruce*'s half-way step away from the traditional "farce and mockery" rule of that Circuit was completed by *DeCoster*'s reconsideration of *Bruce*, there have been similar important developments in this Circuit which support this Court's second expression of hope that the Court of Appeals for the Eighth Circuit undertake the same fundamental reconsideration which was suggested when *Garton* was last here in 1973.

We respectfully suggest, for reasons we shall state in infinitely more detail than we stated the first time, that it is our considered judgment that State court judges and federal district judges in the Eighth Circuit are more in need of a definitive single Sixth Amendment standard at the present time than they were when we made our original suggestion for reconsideration in *Garton* in 1973. Those reasons are stated in the appendix which we attach to this opinion and which we incorporate herein by this reference.

## IV.

For the reasons stated, it is

ORDERED (1) that petitioner should and will be granted appropriate federal habeas corpus relief. It is further

---

**9.** We stated in *Garton* that "We do not believe it is either just or consistent with fundamental principles of comity to fault a State court for selecting any of the federal standards articulated in the Eighth Circuit. But to say that the State courts are free to pick and choose one of several standards articulated by the Eighth Circuit cases is not to say that the Eighth Circuit should not subject what other Courts of Appeals have concluded are inconsistent standards to a reappraisal so that all State courts and all district judges in the Eighth Circuit may apply a proper single standard in all cases in which the question may be presented." [367 F.Supp. at 1362]

ORDERED (2) that petitioner's conviction should be and the same is declared to be null and void, the same having been obtained in violation of the rights guaranteed by the Sixth Amendment to the Constitution of the United States and that petitioner is entitled to a new trial under the circumstances of this case. It is further

ORDERED (3) that execution of this Court's writ of habeas corpus shall be stayed for a period of thirty (30) days within which time, or such additional time as may be granted for good cause shown in writing before the expiration of the time stated, the State of Missouri may grant petitioner a new trial and commence such new trial for the offense involved in this case. It is further

ORDERED (4) that in the event the State of Missouri does not elect to grant petitioner a new trial and to try him within the time stated above, or within such extended time as may be granted for written good cause shown, the Missouri Board of

Parole and Probation shall promptly take all appropriate and necessary steps to advise the petitioner and all persons within or without the State of Missouri who are presently supervising petitioner on parole of this decision of this Court which has determined that petitioner's conviction is null and void and that any and all further supervision on parole shall be immediately terminated under the circumstances.

## APPENDIX

### INEFFECTIVE ASSISTANCE OF COUNSEL:

*The Multiple Rules of the Eighth Circuit And the Increasing Need for Reconsideration And Guidance by the Court of Appeals en Banc*

### I.

We were prompted to write this appendix by what Judge Henley had to say in his dissenting opinion in *Thomas v. Wyrick* (8 Cir. 1976), 535 F.2d 407, the latest controlling decision of the Eighth Circuit.[1] Judge

1. We suspect that we were also at least subconsciously influenced by the recollection of our reaction when we first read then Chief Judge Wyzanski's opinion in *United States v. Sisson* (D.Mass.1969), 297 F.Supp. 902. That case dealt with a defense to a Selective Service prosecution which concerned many federal trial judges at the time. Chief Judge Wyzanski's opinion, when read pragmatically, was more or less a letter to the Supreme Court indicating his view that the Court should accept direct appeal jurisdiction and decide the question presented.

Although a majority of the Justices in *United States v. Sisson*, 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970) did not accept his view of that question, it is quite apparent that what Chief Judge Wyzanski had said received close attention in all three Supreme Court opinions written in that case. The majority opinion actually quoted what he had to say. *Id.* at 279, 90 S.Ct. 2117. Chief Justice Burger took note of the "purposeful delineation" of the District Judge in his dissent, *Id.* at 311, 90 S.Ct. 2117, and stated that he was "satisfied [that] he knew precisely what he was doing—or thought he did on the assumption that his action was reviewable under well-established principles the Court now ignores." *Id.* at 321, 90 S.Ct. at 2146. Justice White stated in his dissent that Chief Judge Wyzanski's opinion and action reflected that the District Judge was "anxious to do his duty as he saw it, and yet aware that ultimate resolution of the constitutional issue

properly belongs in this Court." *Id.* at 348, 90 S.Ct. at 2159. He added that although the issues admittedly were "difficult and far-reaching ones . . . they should be faced and decided." *Id.* at 349, 90 S.Ct. at 2160.

After the most careful consideration, and prompted by Judge Henley's dissent in *Thomas*, we have concluded that there are exceptional occasions which permit a federal district judge, anxious to do his duty as he sees it, to reiterate his hope that the Court of Appeals will reconsider its existing rules of decision which concern all State and federal judges in this Circuit. Rather than including what we shall say as a part of a traditional written opinion, as did Judge James E. Doyle in *Morales v. Schmidt* (W.D.Wis.1972), 340 F.Supp. 544, we have elected to attach an appendix to this opinion in which we shall express our concern. Absent Judge Henley's dissent in *Thomas*, we doubt that we would have been moved to add anything, to our formal opinion in this case. With Judge Henley's dissent, however, the close weighing of the scale was tilted in favor of doing so. The suggestions made in this appendix are made with utmost respect for all judges on our controlling Court and with the hope that what is said may lighten everyone's judicial burdens and make some contribution toward the eventual solution to what we believe are most difficult problems relating to the administration of criminal justice in this Circuit.

Henley stated that he felt it desirable to go somewhat beyond the case before him "in view of the recurrence of post-conviction contentions of inadequate representation by counsel at original trials, the advancing of which has become a standard operating procedure for convicts, and which are most troublesome to judges and embarrassing to the attorneys involved." [p. 419]

We respectfully express our agreement with Judge Henley's suggestion that "a district judge called upon to decide a case of this kind should have some guidelines to follow, and some assurance as to how his decision will be, reviewed on appeal." As will be apparent, we obviously do not agree with Judge Henley's alternative suggestion that *Cardarella*'s "farce and mockery" rule as amplified to some extent in *Scalf v. Bennett* (8 Cir. 1969), 408 F.2d 325, *cert. den.*, 396 U.S. 887, 90 S.Ct. 175, 24 L.Ed.2d 161 (1969), should be adopted as a Sixth Amendment constitutional standard for the Eighth Circuit. We are in total agreement, however, with his suggestion that the Eighth Circuit should determine and definitively announce its adherence to what it concludes is the applicable Sixth Amendment standard and that the State courts and the district courts in this Circuit be called upon to apply the constitutional standard as articulated.

The majority opinion in *Thomas v. Wyrick* definitively stated that "*McQueen* reaffirmed the traditional 'farce or mockery' standard." But the State courts and the district courts in this Circuit were advised by the *Thomas v. Wyrick* majority that they are also under "obligation to proceed on an 'ad hoc' basis," apparently in disregard of whatever standard which may have been articulated and applied by the State courts that had denied relief, and to adopt a "flexible approach" to the determination of the federal constitutional question presented by a Sixth Amendment claim of ineffective assistance of counsel in all State prisoner federal habeas corpus cases.

The majority in *Thomas* concluded that Judge Nangle of the Eastern District of Missouri had not read or applied *McQueen* correctly when he refused to disturb the Supreme Court of Missouri's articulation and application of the Eighth Circuit traditional *Cardarella* "farce or mockery" rule. The majority opinion conceded, however, that "there has been some variance in the language of our opinions and because the proper standard is important in determining this close case, we think it advisable for us to review the applicable law of this circuit." The majority's six-page explanation of *McQueen's* holding, however, did not satisfy dissenting Judge Henley. Among other things, Judge Henley stated in his dissent;

Post-*McQueen* cases mentioned by the district court [which the majority opinion had not cited but which Judge Henley did cite] and in the majority opinion of this court indicate that we may have returned to the "farce and mockery of justice" standard of the older cases if, indeed, we ever departed from it, and that we are at least paying lip service to that standard. I fear, however, that what we may really be doing is deciding cases of this kind by hindsight, on a purely ad hoc basis, and without any real reference to any particular standard of the quality of representation constitutionally required or relating to the extent of prejudice that will require a reversal if representation has been inadequate constitutionally. Such an approach, if it is being taken, is in my view undesirable and unfair to district judges, to state courts, and to lawyers who represent defendants in criminal cases. [*Id.* at 419]

We respectfully suggest that there are at least four different lines of authority presently existing in the Eighth Circuit which a State court judge or a federal district court judge must consider when called upon to determine a Sixth Amendment claim of ineffective assistance of counsel. The multiple choice afforded is indeed a difficult and unpredictable choice because three of the four lines of authority are apparently based upon due process considerations of fairness

rather than Sixth Amendment standards articulated by the Supreme Court and other Circuits.

Particular lines of Eighth Circuit authority are clearly grounded upon due process considerations. One line of authority, however, indicates that Sixth Amendment, rather than due process, standards should be applied. The result which will be reached in a particular case is largely predetermined and controlled by whether due process or Sixth Amendment standards are to be applied in the particular case before the State or Federal court. Both the federal district judges in this Circuit, and more important, the State court judges within this judicial district, are now apparently free to select one or the other of the obviously inconsistent standards in determining a particular State prisoner case. For both State and federal judges were advised in *McQueen* that "We need not now resolve the issue of whether the right to effective assistance of counsel derives solely from the due process clause or also from the sixth amendment's 'more stringent requirements.' See *Moore v. United States,* 432 F.2d 730, 737 (3d Cir. 1970); . . . ." [2]

What will happen in the Court of Appeals when the district judge's decision is reviewed is presently dependent upon whether a majority of the particular appellate judges believes due process or Sixth Amendment standards are to be applied to a particular case.

The choice of conflicting rules is even more difficult for a federal district judge because the State appellate judges in the Eighth Circuit remain generally unconvinced by the rationale of the Eighth Circuit's decisions in this area of the law and either ignore or disregard them. Under the Supreme Court's habeas corpus trilogy, *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); and *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), that practical circumstance creates additional difficulties for the federal judicial system. For a federal district judge is under duty in his application of the Supreme Court's habeas trilogy not to disturb a State court determination of a federal constitutional question by the State courts, if the State courts have reliably found the facts, properly articulated an applicable federal standard, and have properly applied that federal standard to the reliably found factual circumstances of a particular case.

The federal district judge's determination of all those federal questions is, of course, subject to appropriate review by his Court of Appeals and eventually by the Supreme Court. But *McQueen* advises the federal district judges in the Eighth Circuit that "the Supreme Court, however, has never enunciated any clear standards for courts to follow in passing on claims of ineffective assistance of counsel" and that "as a constitutional error, ineffective assistance of counsel is *sui generis.*"

There are any number of examples of recent cases in the Eighth Circuit which demonstrate that a particular federal district judge has been reversed for refusing to grant federal habeas relief in a Sixth Amendment ineffective assistance of counsel case even though his refusal was based upon a State court's articulation and application of one of the multiple lines of Eighth Circuit authority which particular Eighth

2. *Moore v. United States,* a 1970 Third Circuit Court en banc decision, quoted its 1953 "farce and mockery" rule as originally enunciated in *United States ex rel. Darcy v. Handy* (3rd Cir. 1953), 203 F.2d 407, 427, noting that the rationale of that rule was based on denial of due process considerations. The Third Circuit expressly rejected the traditional "farce and mockery" rule and stated "we believe the increased recognition of the constitutional right to the assistance of counsel requires that the standard which prevails in federal cases under the Sixth Amendment should be applied equally to state convictions, to which the same guarantee is made applicable by the Fourteenth Amendment under *Gideon v. Wainwright.* The standard of normal competency applies equally in each case. This standard also makes it clear that the ultimate issue is not whether a defendant was prejudiced by his counsel's act or omission, but whether counsel's performance was at the level of normal competency." [432 F.2d at 737]

Circuit opinions have stated are the applicable federal standards to be applied in a Sixth Amendment ineffectiveness case. Judge Henley recited his experience as a district judge in his *Thomas* dissent in regard to his decision in *Frazier v. Roberts* (E.D.Ark.1970), 310 F.Supp. 504. We will discuss other like examples later in this appendix.

We respectfully suggest that particular lines of Eighth Circuit cases may reasonably be read by both State court judges and federal district judges in the Eighth Circuit as supporting the four following apparently co-existing but inconsistent lines of authority: (1) that *Cardarella's* traditional "farce and mockery" rule is still alive and well in the Eighth Circuit; (2) that while *Cardarella* is still alive and states the applicable rule, that the traditional *Cardarella* rule must be applied in accordance with *McQueen's* "flexible" ad hoc approach, as most recently explained in *Thomas;* (3) that while *Cardarella* is still alive, that rule must not be considered as a "magic formula," but that the due process considerations upon which both (a) the traditional *Cardarella* "farce and mockery" rule and (b) the *McQueen-Thomas* "flexible" ad hoc application of traditional *Cardarella* are based should be stated in language which does not include the use of the words "farce and mockery;" and (4) a quite different line of cases which suggest, we believe properly, that *McQueen* and *Garton* represented but a growing Eighth Circuit recognition that articulation of Sixth Amendment standards must commence with the Supreme Court's seminal decision in *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), and that a definite standard relating to claimed violations of the Sixth Amendment's guarantee of effective assistance of counsel cannot properly be based upon or articulated in terms of due process deprivation.[3]

In spite of all that has been said by various Court of Appeals' panels about *McQueen,* we believe that *McQueen* showed on its face that it did not intend to take more than a half-way step toward a reconsideration of whether the Eighth Circuit should continue to apply due process considerations to a Sixth Amendment claim of ineffectiveness.

The language in *McQueen* which has provoked the most appellate discussion and apparently conflicting views is that portion of *McQueen* which, after quoting the traditional rules stated in *Cardarella* and *Brown,* stated:

Stringent as the "mockery of justice" standard may seem, we have never intended it to be used as a shibboleth to avoid a searching evaluation of possible constitutional violations; nor has it been so used in this circuit. It was not intended that the "mockery of justice" standard be taken literally, but rather that it be employed as an embodiment of the principle that a petitioner must shoulder a heavy burden in proving unfairness. [498 F.2d at 214]

*McQueen,* however, gave a "Cf." citation to *Bruce v. United States,* 126 U.S.App.D.C. 336, 379 F.2d 113 (1967) immediately following that statement. *Bruce,* of course, on its face, reflected but a half-way step on the part of the Court of Appeals of the District of Columbia in its eventual rejection of the "farce and mockery" rule as originally stated in *Jones v. Huff,* 80 U.S.App.D.C. 254, 152 F.2d 14 (1945). *Bruce's* half-way rule, as it was announced in 1945, stated that "farce and mockery" language [of *Jones'* traditional rule] are "not to be taken literally, but rather as a vivid description of the principle that the accused has a heavy burden in showing requisite unfairness." [379 F.2d 116] The language of *Bruce,* of course, was expressly adopted in *Garton.*

---

**3.** Any doubt, however, that *McQueen* represented anything more than a half-way step toward reconsideration of the basic and fundamental question of whether Sixth Amendment ineffectiveness claims should be considered by a definite Sixth Amendment standard rather than by application of due process considera-

tions, was removed by *Thomas.* That case flatly stated to all State and federal district judges in the Eighth Circuit that "*McQueen [v. Swenson,* 498 F.2d 207 (8th Cir. 1974)] reaffirmed the traditional 'farce or mockery' standard."

See 497 F.2d at 1139, and the citation of *Bruce* immediately after *Garton's* citation of *McQueen* at 1140.

*United States v. DeCoster*, 159 U.S.App. D.C. 326, 487 F.2d 1197, 1202 (1973), cited with apparent approval in both *McQueen* and *Garton*, expressly rejected the 1945 *Bruce* rule in 1973 in recognition that *Bruce's* rule rested on "the theory that an ineffectiveness claim is grounded in the due process clause" rather than on "the more stringent requirements" of the Sixth Amendment, quoting *Moore v. United States* (3rd Cir. en banc 1970), 432 F.2d 730, 737, which was also cited with apparent approval in *McQueen*. *DeCoster's* rejection of the *Bruce* rule (which is presently reincarnated in the Eighth Circuit's *McQueen-Thomas* line of Eighth Circuit authority) followed the lead of other circuits which have concluded that a Sixth Amendment claim must be judged under Sixth Amendment, rather than due process, standards. *McQueen* made clear, however, that it was not taking the full step taken by *DeCoster*, for *McQueen* expressly stated that "we [need not] decide whether *at this time* to follow the trend set by the Third, Fourth, Fifth, and District of Columbia Circuits and adopt a standard of 'reasonably competent' representation. See *McMann v. Richardson, supra*, 397 U.S. [759] at 770–771 [90 S.Ct. 1441, 25 L.Ed.2d 763]."

We respectfully suggest that the time has come for the Eighth Circuit, en banc, to answer Judge Henley's call for a fundamental reexamination of Eighth Circuit applicable Sixth Amendment guidelines. No federal district judge in the Eighth Circuit, and more importantly, no State court judge and no state or federal prisoner can have any assurance as to how a district court decision of a Sixth Amendment claim of ineffective assistance of counsel will be reviewed on appeal until that call is heeded. For, under present juridical circumstances,

we respectfully suggest that no one can predict whether any particular panel of the Court of Appeals would agree that the district judge had selected out of the multiple and co-existing lines of conflicting Eighth Circuit authority that single line of authority which a majority of the particular Eighth Circuit appellate panel may determine to be the proper line of authority applicable to that particular case.[4]

Our suggestion that the Court of Appeals en Banc reconsider and determine a definitive Sixth Amendment ineffectiveness standard, and further direct the procedures to be followed by federal district courts in connection with the application of that standard, is based upon Western District of Missouri experience in dealing with similar questions in connection with State prisoner habeas corpus proceedings. All of the present judges of the Western District of Missouri were appointed either before or shortly after the Supreme Court decided the now famous trilogy of *Townsend v. Sain, Fay v. Noia,* and *Sanders v. United States.*

When it became apparent that problems of federal and State court friction could and would likely develop in regard to the implementation of the principles enunciated in the Supreme Court's habeas trilogy, all of the active judges of this Court concluded that this Court should avoid at all costs the additional problems of judicial administration that would be created by inconsistent, and perhaps even conflicting, expressions of opinion from the individual judges of this Court. Those judges therefore decided that in light of the volume and complexity of the massive litigation to be anticipated that they should speak with one voice.

Accordingly, and after appropriate conferences with the Supreme Court of Missouri and with the Attorney General of Missouri and members of his staff, this Court rendered a memorandum opinion of its

---

4. And certainly a federal district court cannot, for example, follow both the traditional *Cardarella* "farce and mockery" rule and one of the other co-existing lines of Eighth Circuit authority, such as the *McQueen-Thomas* rule, in the same case because the application of each of those inconsistent rules dictates a different result in a particular case. Judge Nangle attempted to make such an effort in *Thomas*, only to be reversed by a split decision of the Court of Appeals.

Court en Banc and entered an order which stated as clearly as then possible the principles and policies which all judges of this Court would follow in the determination of State prisoner habeas corpus cases. See *White v. Swenson* (W.D.Mo. en banc 1966), 261 F.Supp. 42. That Court en Banc opinion was received by the Supreme Court of Missouri in the spirit in which it was written, and in a highly commendable manner the Supreme Court of Missouri amended its Rule 27.26 in order to provide the State courts of Missouri with the best post-conviction procedures in the nation. The background and history of those developments are stated in detail by Chief Judge Becker in his article *"Collateral Post-Conviction Review of State and Federal Criminal Judgments On Habeas Corpus And On Section 2255 Motions—View of A District Judge,"* 33 F.R.D. 452 (1963), and in two articles by the author of this appendix, entitled *"Post-Conviction Applications Viewed By A Federal Judge,"* 39 F.R.D. 281 (1965), and *"Post-Conviction Applications Viewed By A Federal Judge—Revisited,"* 45 F.R.D. 199 (1968).[5]

We are confident that all judges of the Court of Appeals share the concern of all federal district judges sitting in Missouri in regard to an apparently increasing tendency on the part of the Supreme Court of Missouri either to ignore or to expressly refuse to follow particular Eighth Circuit decisions which must be followed by all federal district judges in this Circuit. We have directed attention to that problem elsewhere in this appendix. We respectfully suggest that a Court of Appeals en Banc opinion in this difficult area of State prisoner habeas corpus litigation would enable the Eighth Circuit to speak with one voice, with anticipated results which may become comparable to this Court's experience following its Court en Banc opinion in *White v. Swenson*. As the citations of our en Banc in *White v. Swenson* by all Western District of Missouri judges over the years establish, the added benefit of conservation of judicial time supports the use of en Banc determination of particular questions which will foreseeably arise in a large volume of cases.[6]

This Court's en banc decision and order in *White v. Swenson* has been on the books for ten years. *White v. Swenson* was written in recognition "of the anticipated number of cases that undoubtedly will be filed in

---

**5.** From time to time, the Western District of Missouri, in anticipation of the complications certain to arise in numerous State prisoner federal habeas corpus cases, has followed its practice of consultation with the Supreme Court of Missouri and of Court en Banc consideration and determination in order that all judges of this Court may still speak with one voice in connection with new problems which have arisen in the State prisoner habeas field. *Pedicord,* cited elsewhere in this appendix, is an example of that practice. The most recent example is reflected by *Lee v. Wyrick* (W.D. Mo.1974), 383 F.Supp. 623, cited with approval and followed by the Court of Appeals in its unreported opinion in *Triplett v. Wyrick,* No. 75–1181, decided October 22, 1975, in which a difficult problem of exhaustion of available State court remedies under Missouri's recently amended Constitution was considered and determined. See, however, *Martin v. Wyrick* (W.D.Mo.1976), 411 F.Supp. 1069, for further developments in regard to that particular problem.

**6.** The Western District of Missouri has not confined its experimentation with the use of Court en Banc opinions solely to the field of State

prisoner habeas corpus litigation. Its Court en Banc opinion, for example, published as "General Order On Judicial Standards Of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education," (W.D.Mo. en banc 1968) 45 F.R.D. 133, 147–148, recently cited with approval by the Supreme Court of the United States in *Goss v. Lopez,* 419 U.S. 565, 577, fn. 8, 95 S.Ct. 729, 737, 42 L.Ed.2d 725 (1975), is an example of the use of an en Banc opinion in an entirely different field of law. The impact of that Court en Banc opinion inspired almost all institutions of higher education within the State of Missouri to meet the challenge in that particular area of potential conflict by the promulgation of new administrative regulations and procedures which, as a practical matter, have almost eliminated the necessity of litigation in this or any other court. School discipline litigation in the Western District of Missouri has been largely confined in recent years to cases which arise in the single Missouri institution of higher education which has not yet promulgated modern administrative procedures for its own determination of the questions presented in school discipline cases.

this Court," 261 F.Supp. at 60, and was prompted by the fact that "all courts, both state and federal, share the common concern to devise improved and more efficient techniques of judicial administration." *Id.* at 54. We believe that federal and State court experience in the State of Missouri over the past ten years supports the suggestion that the Statement of Policy this Court made in 1966 has enabled both State and federal courts in Missouri to avoid many of the difficulties encountered elsewhere throughout the country.[7]

We believe that it can fairly be said that the judicial time expended in the preparation of this Court's en Banc decision in *White v. Swenson* has eventually saved untold hours of judicial time which would have been otherwise required, had the questions presented and the policies determined

been developed by the individual, rather than the collective, efforts of each member of this Court.

There are, of course, still a few exceptional examples of judicial breast-beating and the sounding of judicial Rebel yells in Missouri in regard to the proper processing of State prisoner cases, as is illustrated by *Agee v. State,* (Mo.App.Springfield Dist. 1976) 512 S.W.2d 401, 403, and by the other State cases cited in that opinion.[8] Those now exceptional cases rest, however, upon the unsupportable notion that *all* State trial courts fully comply with *all* requirements of Missouri's Rule 27.26 and with the command of the Supreme Court's habeas corpus trilogy in *all* State prisoner post-conviction cases.

Such a notion must, we suggest, be viewed in light of the specific Rule 27.26

---

**7.** Although procedural process in dealing with State prisoner habeas cases has been refined and improved in this Court over the past ten years, the Statement of Policy, as it was included in the appendix attached to *White v. Swenson* ten years ago, has remained the same. That policy, which reflects the long standing, consistent policy of this Court, states:

1. The judges of the United States Courts desire a State court record in each post-conviction proceeding on which they can conscientiously deny Habeas Corpus without an evidentiary hearing in cases where the State Courts have denied post-conviction relief.

2. The United States District Court for the Western District of Missouri has adopted, and hopes that the State courts adopt, a procedure in which post-conviction complaints can be fully and, as far as possible, finally adjudicated in one proceeding involving no more than one evidentiary hearing. The object of this is to hear all complaints and simultaneously save the time of the State officers, including the judge, Attorney General, Prosecuting Attorney and lawyers appointed for defendants.

3. As a general rule, it appears that every persistent convict will eventually secure at least one plenary evidentiary post-conviction hearing. The reason for this is that the opinions of the Supreme Court of the United States now hold that an evidentiary hearing is required on the unsupported allegation of facts by a convict indicating a violation of his Federal constitutional rights, even though judicial and other officers may have personal knowledge that the allegations are wholly false.

4. The United States District Courts would prefer that this one plenary evidentiary hearing be accorded State convicts by State courts. However, if the State courts do not accord the State convict the evidentiary hearing on one or more of his claims of violation of Federal constitutional rights, then the United States District Courts are obligated to accord the hearing to the convict. [261 F.Supp. at 63]

The problem of appointment of counsel for the defendant, set forth in paragraph 2 above, an essential prerequisite to an adequate evidentiary hearing, was a difficult problem in 1966. In 1976, the problem has largely been solved by the creation of the office of Federal Public Defender and by State Defender systems in the various States.

**8.** *Agee* cited the Eighth Circuit's opinions in *McQueen, Garton,* and *Stidham v. Swenson* (8th Cir. 1974), 506 F.2d 478, as examples of federal court decision which supported the following statement of that court:

We are well aware that irrespective of the findings of experienced state trial judges, who hear the evidence first-hand and have the opportunity to observe the demeanor of the witnesses, and the further determination of state appellate courts that such findings are not clearly erroneous and are supported by the record, there are those with omniscient hindsight who render state post-conviction proceedings an exercise in futility and further "endanger the delicate federal-state relationship in the criminal law enforcement field." *Fields v. State, supra* [Mo., 468 S.W.2d 31]. [512 S.W.2d at 403].

performance of a particular State trial judge in the particular case before that court and, perhaps even more important, in light of the manner in which that compliance effort was treated when the decision of the State trial judge was reviewed by the particular Missouri appellate court under the circumstances.

We quite agree, of course, that when a State trial court does in fact fully comply with Rule 27.26, the case may be processed through the State appellate courts, and thereafter, through the federal system, without difficulty from that point on. See, for only one reported example, *Robinson v. Swenson* (W.D.Mo.1971), 331 F.Supp. 483.

Experience over the years shows, however, that the cases which have been properly processed in the State courts with full Rule 27.26 compliance are *not* the cases in which federal district courts are required, under the Supreme Court's habeas trilogy, to conduct any further plenary evidentiary hearing. Nor are those generally the cases in which either federal trial or appellate court judges are required to grant federal habeas corpus relief under the circumstances.

The cases in which federal courts are most frequently forced to act are those cases in which they are required to consider factual circumstances which are revealed for the first time by an adequate evidentiary hearing which has been conducted in the federal district court, rather than in the State trial court, solely because the State trial court had refused to conduct an adequate evidentiary hearing in compliance with Rule 27.26.

We do not believe that the federal courts can reasonably be accused of endangering "the delicate federal-state relationship in the criminal law enforcement field" by the exercise of "omniscient hindsight," as was suggested in *Agee,* when federal courts base their decisions upon factual circumstances which are revealed for the first time in federal evidentiary hearings which the State courts, by their refusal to comply adequately with Rule 27.26, have forced federal courts to conduct.

We respectfully suggest that Sixth Amendment ineffectiveness cases are among the most difficult of all State prisoner post-conviction claims to process in both the State courts and federal courts. And, as Judge Henley pointed out in his *Thomas* dissent, an ineffectiveness claim may be anticipated as "a standard operating procedure for convicts" in many more cases to come. We express the hope that the Court of Appeals will give appropriate consideration to the experience which the Western District of Missouri has had in the past ten years as a result of its utilization of the readily available judicial tool of Court en Banc decisions.

## II.

This very case is as good an example as any to illustrate how a district judge may be reversed for failing to apply a particular line of the various co-existing lines of Eighth Circuit authority.[9] When this case was first here, we refused to disturb the Supreme Court of Missouri's articulation and application of *Cardarella's* "farce and mockery" rule, because, after all, that rule reflected one of the lines of authority which had been expressly articulated and many times approved and applied by our control-

---

**9.** *Garton* is perhaps a better example than that stated by Judge Henley in his dissenting opinion in *Thomas* when he related his experience in connection with *Frazier v. Roberts.* As Judge Henley pointed out, his district court decision in *Frazier v. Roberts* was reversed without any discussion by the Court of Appeals of the standard he had applied as the district judge in that case. Although the Court of Appeals in *Garton* did not discuss the reasons why the district court believed it had been required to apply the "farce and mockery" rule

in that case, the Court of Appeals did discuss the "farce and mockery" rule and why it concluded that the district court had erred in not anticipating the modification, if any, that *McQueen* would make to the *Cardarella* rule. The Court of Appeals, of course, did not discuss in either *Frazier* or *Garton* the problems which a federal district judge in the Eighth Circuit faces when he views the multiple and inconsistent lines of co-existing authority which are discussed in this appendix.

ling court. While the Court of Appeals in *Garton* expressly declined "to depart from its standards for measuring ineffective assistance of counsel," which obviously included *Cardarella,* this Court was nevertheless reversed.

In reversing in *Garton,* the Court of Appeals concluded that "the district court has read our ['farce and mockery'] decisions too narrowly." It stated that the Eighth Circuit had never intended in any of its prior opinions to use the "mockery of justice" words in any "talismanic" sense and that this and other State and federal courts in the Eighth Circuit should have known and understood that "we have employed [those words] to encompass the principle that a petitioner . . . bears the heavy burden of proving unfairness." *Id.* at 1139. As we have above noted, that explanation of the meaning of the words "farce and mockery" is a direct paraphrase of the almost identical language of the *Bruce* half-step rule adopted in the District of Columbia Circuit in 1967, only to be expressly rejected by that Circuit in 1973 by its decision in *DeCoster,* a case which, unlike *McQueen,* did follow the lead of other circuits in refusing to apply due process considerations to Sixth Amendment claims of ineffectiveness.

This Court's experience in *Garton,* however, suggests that State court judges and the federal district court judges in the Eighth Circuit are more in need of a definitively articulated constitutional standard to apply in Sixth Amendment ineffective assistance of counsel cases at the present time than they were when this case was first before this Court in 1973. For at that time, and until *McQueen* and *Garton* were decided, no State or federal judge in the Eighth Circuit had ever been advised that the Eighth Circuit did not mean exactly what it had always said when it had, over the years, articulated and applied *Cardarella's* "farce and mockery" rule. Whatever gloss *Thomas* may have put on *McQueen,* we respectfully suggest, is not likely to clarify the current juridical situation. Indeed, if appellate treatment of *McQueen* is any guide, the decision of *Thomas* is likely to further complicate the predictions which each district court in the Eighth Circuit must make when considering a Section 2255 motion or a State prisoner habeas corpus claim based on Sixth Amendment ineffectiveness, in regard to what co-existing line of Eighth Circuit authority it should apply to the particular case under consideration.

For further example, this Court learned back in 1971, or at least it thought it had learned from *State of Missouri v. Turley* (8th Cir. 1971), 443 F.2d 1313, 1317, that the single and only "standard" recognized by the Eighth Circuit was the "farce and mockery" standard articulated in *Cardarella v. United States* (8th Cir. 1967), 375 F.2d 222. For it was by the Court of Appeals' articulation and application of that single "standard" that our grant of habeas corpus in *Turley v. Swenson* (W.D.Mo.1970), 314 F.Supp. 1304, was reversed.[10] The Court of

---

10. *Turley,* of course, was based on our earlier Sixth Amendment opinions in *Goodwin v. Swenson* (W.D.Mo.1968), 287 F.Supp. 166; *Brizendine v. Swenson* (W.D.Mo.1969), 302 F.Supp. 1011; *Pedicord v. Swenson* (W.D.Mo. en banc 1969), 304 F.Supp. 393, aff'd. on an alternate ground (8th Cir. 1970), 431 F.2d 92, and *Davis v. Swenson* (W.D.Mo.1970), 308 F.Supp. 635.

In all of those cases, in several of which the State of Missouri noticed but subsequently dismissed appeals, we expressly recognized, as expressly stated in *Goodwin,* that there were any number of Eighth Circuit cases which had frequently used such words as "travesty," "sham," "farce," or "mockery of justice," in ruling ineffective assistance cases. We directed attention, however, to other Eighth Circuit

cases, particularly cases such as *Maye v. Pescor* (8th Cir. 1947), 162 F.2d 641, 643 (which long ante-dated *Cardarella* and which expressly, and we believe properly, relied upon *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and *Avery v. Alabama,* 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940) (which did not use any language even close to "farce and mockery").

We therefore concluded in *Turley,* as we had consistently concluded in *Goodwin* and all our subsequent Sixth Amendment cases, that it was permissible for an Eighth Circuit district judge to conclude that in spite of "farce and mockery" language in some of the Eighth Circuit cases, the actual decisions of the Eighth Circuit "cases do not turn on the formal lan-

Appeals concluded in *Turley* that this Court erred when it failed to make the literal application of *Cardarella's* "farce and mockery" rule as had the Supreme Court of Missouri and that we had erroneously concluded that "the recent decisions of the Supreme Court of the United States in *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763, decided May 4, 1970, and *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747, decided on the same day, articulate and reiterate the principles applied in the earlier Supreme Court of the United States cases cited and discussed in *Pedicord* and *Goodwin.*" [11] In short, *Turley* made it clear in 1971, at least to this Court, that the district judges in the Eighth Circuit were under duty to apply *Cardarella's* "farce and mockery" rule in the most literal manner and that they further were to conclude as a matter of federal constitutional law that if the State appellate court had articulated and applied a "farce and mockery" rule in denying relief, a federal district court was

to conclude that it had properly stated the applicable federal standard.

Another problem exists, of course, in regard to the approval of any "farce and mockery" rule as a Sixth Amendment ineffectiveness standard. For farce and mockery rules have a way of being as different as the size of the Chancellor's foot, as described over three hundred years ago in John Selden's *Table Talk.*[12]

In footnote 2 of *Garton,* we set forth Missouri's version of the "farce and mockery" rule. That footnote, 367 F.Supp. at 1359, stated:

Missouri apparently continues to accept the standard set forth in *State v. Dreher,* 137 Mo. 11, 38 S.W. 567 (1897), which concluded that "the neglect of an attorney is the neglect of his client" and that "neither ignorance, blunders, nor misapprehension of counsel, not occasioned by his adversary, is ground for setting aside a judgment or awarding a new trial." That case added that such a rule "is

guage used by a particular court to state the applicable rule," 287 F.Supp. at 183. We therefore concluded, as was much later said in *McQueen* and *Garton,* that the "farce and mockery" language of *Cardarella* and other Eighth Circuit cases should not be given a literal meaning and we refused to do so.

When we were called upon to decide *Garton* the first time, however, we were forced to conclude in light of the Court of Appeals' express rejection of the rationale of all our earlier Sixth Amendment cases in *Turley,* that we could not properly refuse to follow our controlling court's opinion in *Turley* in our determination of *Garton.* But, as is apparent from the Court of Appeals' opinion in *Garton,* we again erred in failing to read the Eighth Circuit's decisions as we had always read them before *Turley* was decided. Unless the question is reconsidered by the Court of Appeals en banc, it is entirely possible that should we now go back to the rationale of our *Goodwin* case, which was quoted with approval in *McQueen,* (see 498 F.2d at 217) we could promptly be reversed still another time if the particular panel of the Court of Appeals believed the traditional *Cardarella* rule as articulated and applied by the Court of Appeals in *Turley,* should once again be considered as the proper Eighth Circuit rule.

11. The Supreme Court cases which we listed in our decision in *Turley,* which we had earlier discussed in our *Goodwin* and *Pedicord* opinions, were as follows:

*Kercheval v. United States* [274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927)]; *Powell v. State of Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Johnson v. Zerbst* [304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)]; *Avery v. State of Alabama,* 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Adams v. United States ex rel. McCann,* 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942); *Hawk v. Olson,* 326 U.S. 271, 66 S.Ct. 116, 90 L.Ed. 61 (1945); *Von Moltke v. Gillies,* 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948); *Chandler v. Fretag,* 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954); *Pennsylvania ex rel. Herman v. Claudy,* 350 U.S. 116, 76 S.Ct. 223, 100 L.Ed. 126 (1956); *Moore v. State of Michigan,* 355 U.S. 155, 78 S.Ct 191, 2 L.Ed.2d 167 (1957); *Machibroda v. United States,* 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); and *Anders v. State of California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

12. Said John Selden: "One Chancellor has a long foot, another a short foot, a third an indifferent foot. 'Tis the same thing in the Chancellor's conscience." [Bartlett's *Familiar Quotations* p. 130, 11th ed.]

founded upon the wisest public policy." This language from *State v. Dreher* is quoted with approval and followed in several recent Supreme Court of Missouri cases involving ineffective assistance questions. See, e. g., *State v. Worley,* 371 S.W.2d 221 (Mo.1963).

*State v. Worley,* cited in that footnote, has been cited with approval by a Missouri appellate court most recently in support of Missouri's ineffectiveness rule and its narrow scope of post-conviction evidentiary hearing in a Sixth Amendment case in *Shepherd v. State* (Mo.App.1975), 529 S.W.2d 943, 948. More significantly, *Worley* was again cited and relied upon by the Supreme Court of Missouri in *Coney v. State* (Mo.1973), 491 S.W.2d 501, 510. Contrary to its holding in *Thomas,* decided a few weeks after *Coney v. Wyrick,* 1976, 532 F.2d 94, the Eighth Circuit concluded in the latter case that the Eastern District of Missouri had properly refused to disturb the Supreme Court of Missouri's application of the "farce and mockery" rule.

It should be added, however, that, in spite of the possibility that a real difference exists between the Eighth Circuit's *Cardarella,* rule and Missouri's particular brand of still another "farce and mockery" rule, it is clear that under the impact of Western District of Missouri cases such as *Goodwin, Pedicord,* and other Western District of Missouri cases based on Sixth Amendment rather than due process standards, particular Missouri appellate courts have frequently departed from application of any "farce and mockery" rule, Eighth Circuit or otherwise, and have been applying Sixth Amendment standards to ineffective assistance of counsel cases. See, for example, Judge Swofford's opinion in *Thomas v. State* (Mo. App., K.C. District 1974), 516 S.W.2d 761, which is an excellent example of how some Missouri appellate courts have been dealing with ineffective assistance of counsel questions since *Goodwin* and its progeny were decided by this Court.

Our initial determination in *Garton* was thus controlled by the Court of Appeals'

holding in *Turley* that we must not refuse to apply "farce and mockery" in a talismanic sense. When we wrote *Garton* the first time around, we were convinced that we were under judicial duty to follow our controlling court's decision in *Turley* and that if the record established that the Supreme Court of Missouri had articulated and applied the traditional "farce and mockery" rule, as it clearly did, then this Court was under duty to decide that a proper federal standard had been articulated and followed by that State court. We discharged that duty and were reversed by a panel which apparently did not accept the traditional "farce and mockery" rule as the *Turley* panel did.

We respectfully suggest that in spite of our complete acceptance of the Attorney General of the State of Missouri's reading of *McQueen,* agreed to by counsel for the petitioner, that this case could again be reversed if the panel which draws this case on appeal is as committed to the traditional "farce and mockery" rule as was the panel that decided *Turley.*

We believe that the example of this case supports the suggestion made by Judge Henley in his *Thomas* dissent.

### III.

We respectfully suggest that Judge Nangle was in an even more difficult position when he was recently called upon to decide *Thomas v. Wyrick,* when that case pended in the Eastern District of Missouri, than this Court was in when it first considered *Garton* in 1973. Judge Nangle could have assumed that the Court of Appeals opinion in *Turley,* which definitively directed federal district judges in Missouri not to disturb an articulation and application of a *Cardarella* "farce and mockery" rule by the Supreme Court of Missouri, may have been overruled *sub silentio* by the Court of Appeals' reversal of this Court's decision in *Garton,* and that the holding of *McQueen* was to be applied in his case, rather than that of *Turley.* Judge Nangle's difficulty, of course, arose from trying to determine

whether *McQueen* had, in turn, been overruled *sub silentio* by various of the post-*McQueen* cases cited in this appendix.

As will be noted, Judge Nangle apparently concluded that although the *McQueen* "flexible" ad hoc approach line of authority was on the Eighth Circuit's books, particular Eighth Circuit opinions also articulated and approved *Cardarella*'s "farce and mockery" rule in its traditional form. Under those cases, as *Turley* taught, Judge Nangle understood that a federal district judge in Missouri could not properly grant federal habeas corpus relief if the Missouri appellate court had articulated and applied a "farce and mockery" rule when it denied State prisoner post-conviction relief. Judge Nangle's problems were more complicated than those faced by this Court when it decided *Garton* in 1973 by reason of the fact that the majority opinion of the Supreme Court of Missouri en banc had refused to mention or attempt to apply the Eighth Circuit's earlier holding in *McQueen* when it decided *Thomas v. State of Missouri*, 512 S.W.2d 116 (Mo. en banc 1974).

In his determination of the federal habeas proceeding which pended before him, Judge Nangle was required first to examine the basis on which the Supreme Court of Missouri had denied the petitioner's claim of a federally protected constitutional right. Judge Nangle found that a sharply divided Supreme Court of Missouri, en banc, had concluded on June 24, 1974, without any reference whatsoever to the Eighth Circuit's earlier decision in *McQueen*, that the applicable "farce and mockery" rule had been properly stated in Judge Finch's concurring opinion in *McQueen v. State* (Mo. en banc 1971), 475 S.W.2d 111.

The June 24, 1974 date is significant because the Eighth Circuit had approximately three weeks earlier, on June 4, 1974, reversed Judge Wangelin's dismissal of McQueen's federal habeas petition in *McQueen v. Swenson*, 498 F.2d 207.[13] Rather, the majority opinion of the Supreme Court of Missouri en banc in *Thomas* not only relied on its own decision in *McQueen* but it also relied upon its own opinion in *Garton v. State* (Mo.1970), 454 S.W.2d 522. The Eighth Circuit's opinion in *Garton* was also on the books when the Supreme Court of Missouri en banc decided *Thomas v. State*.

The Supreme Court of Missouri, in applying its own rather than the Eighth Circuit's rule concluded that:

> The test on this question which this court has stated on several occasions is whether counsel's actions, or lack thereof, have made the trial a farce or mockery of justice. *Garton v. State*, Mo., 454 S.W.2d 522, 530; *Holbert v. State*, Mo., 439 S.W.2d 507, 509; *Holt v. State*, Mo., 433 S.W.2d 265, 267. This is the test which many federal courts, including the Court of Appeals for the 8th Circuit, have adopted. *Cardarella v. United States*, 8 Cir., 375 F.2d 222, 230, *cert. den.*, 389 U.S. 882, 88 S.Ct. 129, 19 L.Ed.2d 176; *Kress v. United States*, 8 Cir., 411 F.2d 16, 22; *Borchert v. United States*, 9 Cir., 405 F.2d 735, 738, *cert. den.* 394 U.S. 972, 89 S.Ct. 1466, 22 L.Ed.2d 753; *Johnson v. United States*, 10 Cir., 380 F.2d 810, 812; cases cited in 17 Mod.Fed.Prac.Dig., Crim.Law, ⊚641.13(1).[14]

**13.** There can be no doubt that the Supreme Court of Missouri knew that *McQueen* had been decided by the Eighth Circuit at the time the Supreme Court of Missouri decided *Thomas v. Wyrick*. For dissenting Judge, now Chief Justice Seiler quoted extensively from the Eighth Circuit's opinion in *McQueen*, including that portion of *McQueen* which had in turn quoted with approval what this Court had to say in *Goodwin*: "The most able and competent lawyer in the world can not render effective assistance in the defense of his client if his lack of preparation for trial results in his failure to learn of readily available facts which

might have afforded his client a legitimate justiciable defense."

**14.** Judge Finch's concurring opinion in *McQueen*, quoted as the applicable State rule in *Thomas v. State*, did have some language similar to the Eighth Circuit's opinion in *McQueen*, Judge Finch, without reference to the Eighth Circuit's *McQueen*, suggested that the "farce and mockery" rule "perhaps sounds unduly restrictive or harsh by reason of the choice of descriptive terminology." But as the Eighth Circuit supposedly made clear in its *McQueen* opinion, the Eastern District of Missouri committed reversible error when it failed

It is impossible, or at least too early, to assess other State court reaction to the Eighth Circuit's decision in *McQueen* because that case has as yet been infrequently cited by many of the various State appellate courts in the Eighth Circuit. Another Missouri case, *Agee v. State* (Mo.App., Spring. Dist.1974), 512 S.W.2d 401, has recently cited *McQueen*. The Eighth Circuit's opinion in *McQueen* was cited, however, as only a prime example of a federal court decision written by "those with omniscient hindsight who render state postconviction proceedings an exercise in futility and further 'endanger the delicate federal-state relationship in the criminal law enforcement field,'" quoting from *Fields v. State* (Mo.1971), 468 S.W.2d 31.

*Fields*, of course, was a comparatively recent case in which the Supreme Court of Missouri did take note of another Eighth Circuit opinion on a federal question which it expressly refused to follow. The Supreme Court of Missouri said in *Fields* that "we acknowledge the rejection of this position by the United States Court of Appeals for the Eighth Circuit on May 24, 1971. *Frazier v. Roberts (Steed)*, 8 Cir., 441 F.2d 1224 (opinion written on petition for rehearing). We regret the extent to which the problem presented may endanger 'the delicate federal-state relationship in the criminal law enforcement field.' . . . Our holding, of course, 'will not preclude inquiry into [appellant's] claim in a federal habeas corpus proceeding.' *Frazier v. Roberts (Steed), supra*, 441 F.2d 1224." [15]

We have stated the difficulties which Judge Nangle was required to face when he was called upon to decide whether he should or should not approve the Missouri Supreme Court's most recent application of *Cardarella's* "farce and mockery" rule in *Thomas v. State* in order to highlight the additional problems which a federal district judge faces in 1976, as compared to those he faced before *McQueen* was on the books.

Among the additional questions which Judge Nangle had to answer was whether the Eighth Circuit had really taken *Cardarella's* "farce and mockery" rule off the books when it wrote *McQueen* and *Garton* and whether the Supreme Court of Missouri was free to apply, as it did in *Thomas v. State*, its own decisions in *McQueen* and in *Garton*, regardless of the Eighth Circuit's earlier decisions in federal habeas cases which involved the same defendants.

Judge Nangle, in his unreported opinion in *Thomas*, dutifully took note of the earliest post-*McQueen* case of *Crenshaw v. Wolff* (8th Cir. 1974), 504 F.2d 377, 380, which stated that "this court in *McQueen* declined to rule whether the 'mockery of justice' standard should be abandoned in favor of the standard more recently established in other jurisdictions." He cited *DeBerry v. Wolff* (8th Cir. 1975), 513 F.2d 1336, 1340, which flatly stated that "it is clear . . . that the so-called 'mockery of justice' standard for ineffectiveness of counsel, [is] still followed in this circuit . . . ." Judge Nangle quoted at length from *Johnson v. United States* (8th Cir. 1974), 506 F.2d 640, which expressly stated in footnote 9 on page 646 that "in *McQueen v. Swenson, supra*, 498 F.2d at 214, we made it clear that we still adhere to the consistent standard applied in *Cardarella v. United States*, 375 F.2d 222, 230 (8th Cir.),

to find and conclude that the Supreme Court of Missouri had improperly articulated and applied the applicable federal rule when it denied McQueen post-conviction relief in regard to his State prisoner's federal habeas ineffectiveness claim.

It is therefore difficult to conclude that the Eighth Circuit's *McQueen* rule and the Supreme Court of Missouri's *Thomas* rule are statements of the same rule in different words.

**15.** The divisional opinion in *Fields* was more recently considered and affirmed by the Supreme Court of Missouri en banc in *Schleicher v. State* (Mo. en banc 1972), 483 S.W.2d 393. The considered refusal of a State appellate court to accept and follow an opinion of the Eighth Circuit in regard to any federal constitutional question, of course, simply shifts the judicial burden of determining whether a State criminal prosecution has been conducted in accordance with the Constitution of the United States from the State courts, which under that Constitution, have primary responsibility for the administration of State criminal justice, to the federal court system for appropriate review of the federal questions presented.

cert. denied, 389 U.S. 882, 88 S.Ct. 129, 19 L.Ed.2d 176 (1967), and *Brown v. Swenson,* 487 F.2d 1236, 1240 (8th Cir.), cert. denied, 416 U.S. 944, 94 S.Ct. 1952, 40 L.Ed.2d 296 (1974), in spite of the fact that we have, at various times, expressed 'the same thought in other words.'" Judge Nangle also cited *United States v. Valenzuela* (8th Cir. 1975), 521 F.2d 414, 419, in which the majority opinion concluded that the defendant's ineffectiveness claim had not been established on direct appeal.[16] Faced with that array of decisions from his controlling court, and there are other like Eighth Circuit decisions to the same effect to which he could have made reference,[17] Judge Nangle concluded that:

> This Court believes the applicable rule defining the parameters of the Sixth Amendment right to assistance of counsel is in this Circuit the "farce" or "mockery of justice" rule announced in *Cardarella.*

Judge Nangle's acceptance of that rule, of course, predetermined that federal habeas relief would be denied. In denying relief, however, Judge Nangle recognized the truism applicable to most close Sixth Amendment ineffective assistance of counsel cases, namely, that "if the applicable rule were the one adverted to by Judge Matthes in *Crenshaw,* i. e., 'reasonably competent assistance of counsel,' I believe petitioner would not have been afforded his constitutional right to assistance of counsel."

*Thomas v. Wyrick* (8th Cir. 1976), 535 F.2d 407, in which Judge Nangle was reversed, on the theory that he did not understand *McQueen,* is the last word State court judges and federal district court judges have for guidance from the Eighth Circuit. We respectfully suggest that Judge Henley's call for reconsideration of the applicable Eighth Circuit rule in Sixth Amendment

cases be given appropriate consideration by the Eighth Circuit en banc. We respectfully suggest that under present circumstances a federal district judge in this Circuit can have no "assurance as to how his decision will be reviewed on appeal," as Judge Henley put it, because no one can predict what panel of the Court of Appeals will draw his decision for review.

## IV.

But it is respectfully suggested that every State judge and every district judge in the Eighth Circuit who attempts properly to apply the rules of decision of the Eighth Circuit is familiar with the fact that he gets different readings and applications of one or more of the four existing lines of Eighth Circuit authority in almost every handdown of slip opinions, dependent upon what panel of Eighth Circuit judges happens to decide the case. The slip opinions to which we shall make reference were all handed down in 1976, excepting only *Garza v. Wolff,* 8 Cir., 528 F.2d 208, which was decided on December 23, 1975. We believe that it can fairly be said that, when read together, those opinions clearly reflect the existence of (1) one line of authority in the Eighth Circuit which concludes that the *Cardarella* "farce and mockery" rule, in its traditional form, is to be applied by all State court and federal district judges in the Eighth Circuit; and (2) a second line of authority which, although conceding the continued viability of *Cardarella's* rule, requires that the "farce and mockery" rule be applied in accordance with gloss added by *McQueen,* as now explained by *Thomas.*

*Garza,* which reversed the District of Nebraska, could be said to represent still a third line of authority because the district court was reversed in that case without any discussion of any standard which should

---

16. The dissenting opinion in *Valenzuela,* on the other hand, protested that "the standard applied in this Circuit, the 'mockery of justice' standard, is not to be taken 'literally'" and that the "heavy burden of proving unfairness," stated in *McQueen,* had, in the dissenter's judgment, been carried under the circumstances of the case.

17. See, for example, *United States v. Hager* (8th Cir. 1974), 505 F.2d 737, 739, cited with approval by the majority in *Valenzuela,* which quoted *Cardarella* and flatly stated that "the standard for ineffectiveness of counsel followed by this circuit is the so-called 'mockery of justice' standard."

have been applied by the district court in its review of the Supreme Court of Nebraska's denial of post-conviction relief.

The Supreme Court of Nebraska concluded that the circumstances of that case did not "shock the conscience of the court," a first cousin to the "farce and mockery" rule. See *State v. Garza,* 191 Neb. 118, 214 N.W.2d 30, 32 (Neb.1974).

The Eighth Circuit opinion in *Garza* does not make clear whether the federal district court conducted a plenary evidentiary hearing. What is clear, however, is that petitioner's brother was not called as a defense witness and that the Court of Appeals, apparently reviewing the case *de novo,* took a different view of a cold State court trial transcript and the State post-conviction hearing transcript than did the Supreme Court of Nebraska or the federal district judge. The Court of Appeals stated that its "careful examination of the record reveals that [the federal district court's] rulings were predicated on misinterpretations of the record" and that the federal district judge "took his finding from the erroneous report of it in the Supreme Court of Nebraska opinion."

When we read *Garza* shortly after it was handed down, we could not help but wonder whether essentially the same factual circumstances may have been presented in that case as were presented in *Garton,* which was then before us on remand. For the Supreme Court of Nebraska's opinion expressly stated that defense counsel had in fact "located the brother in Chicago and he refused to come back [to Nebraska] for the trial." 214 N.W.2d at 31. If that fact had been reliably found by the State courts, and there is no indication in the Court of Appeals' opinion that it was so found, we were caused to wonder why it had been necessary for the Court of Appeals to wade through all of the State court transcripts in order to decide the case. For it seemed clear that defendant's brother was obviously a key defense witness. We finally concluded that the case caused difficulty, as is evidenced by the split decision, for the reason that apparently no one made appropriate inquiry

as to whether defense counsel was aware that the State of Nebraska had adopted the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, in 1937, see Neb.R.R.S.1943, §§ 29–1906 to 29–1911, and that the State of Illinois had adopted the same Uniform Act in 1959. See Ill.S.H.A. Ch. 38, §§ 156–1 to 156–6.

The amount of judicial time expended by the Court of Appeals may have been substantially shortened if, at the almost always required federal habeas plenary evidentiary hearing, appropriate inquiry had been made in regard to defendant's counsel's investigation of and knowledge of Nebraska law which would have enabled him to require the attendance of the brother as a key defense witness, regardless of whether the brother may have wanted to return voluntarily from Illinois to testify in Nebraska. If the defendant's trial counsel had testified that he had investigated the law and that he did have knowledge of the Uniform Acts, further inquiry would have been required as to why he did not utilize the available procedure to obtain the brother's testimony at trial. Determination of whether the defendant was afforded the effective assistance of counsel guaranteed him by the Sixth Amendment would have then been made in light of the answers given, when viewed in light of the other facts and circumstances of the case.

Failure on the part of the district court to have conducted an appropriate evidentiary hearing, and failure of the district court to state findings of fact and make conclusions of law, would have required immediate remand by the Court of Appeals for cure before appellate review on the merits. *Garza,* of course, was not based on any such rationale. We respectfully suggest that district judges cannot look to *Garza* for guidance.

All of the slip opinions handed down in 1976 proceed on the implicit assumption, but do not decide, that a Sixth Amendment claim of ineffectiveness should be considered in light of due process of law considerations rather than Sixth Amendment

standards, a question expressly left open in *McQueen.* None of those 1976 slip opinions can reasonably be said to fall within the additional lines of authority we discuss elsewhere in this appendix. In other words, none of the 1976 slip opinions suggest, as *Crismon v. United States* (8th Cir. 1975), 510 F.2d 356, 358, suggested, that the words "farce and mockery" should not be considered as a "magic formula" and that those words should not be mentioned in a due process consideration of an ineffectiveness claim. Nor do any of those cases fall within still another line of Eighth Circuit authority which apparently views *McQueen* and will presumably view *Thomas* as but a half-step in an evolutionary judicial process which would eventually lead to a definite answer to questions expressly left open in *McQueen,* namely, whether the Eighth Circuit should join other circuits in concluding that Sixth Amendment standards, rather than due process considerations, are to be applied in an ineffectiveness case, and whether the Eighth Circuit should "follow the trend set by the Third, Fourth, Fifth and District of Columbia Circuits and adopt a standard of 'reasonably competent' representation." Those lines of authority will be discussed in a later part of this appendix. We turn now to the slip opinions which clearly reflect the existence of the first two lines of co-existing Eighth Circuit authority.

In *Franklin v. Wyrick,* 8 Cir., 529 F.2d 79, the Court of Appeals on January 8, 1976 concluded that "this circuit continues to follow the 'mockery of justice' standard in determining whether trial counsel was so ineffective as to deny a fair trial to a criminal defendant." The Court, in spite of *Crismon's* earlier statement, once again quoted the "magic language" of *Cardarella,* cited *United States v. Hager* (8th Cir. 1974), 505 F.2d 737; *Garton v. Swenson* (8th Cir. 1974), 497 F.2d 1137; and *Johnson v. United States* (8th Cir. 1974), 506 F.2d 640, cert. denied 420 U.S. 978, 95 S.Ct. 1404, 43 L.Ed.2d 659 (1975); and then summarized the holding of *McQueen* by stating that *McQueen* established that "the 'mockery of justice' standard is not an impenetrable obstacle however." [18] In *Schleicher v. Wyrick,* 8 Cir., 529 F.2d 906, decided February 4, 1976, the Court of Appeals affirmed the Eastern District of Missouri's denial, without evidentiary hearing, of a Sixth Amendment ineffective assistance of counsel claim by quoting with approval *Cardarella's* statement that "perfect or errorless counsel is not required as a prerequisite to a fair trial consonant with due process." That particular panel of the Court of Appeals did indicate its agreement with *Franklin v. Wyrick's* "impenetrable obstacle" language, but it did not state what it understood those words to mean.[19] In *Coney v. Wyrick,* 8 Cir., 532 F.2d 94, decided March 8, 1976, in

**18.** *Franklin v. State* (Mo.1973), 501 S.W.2d 166, 170, shows that the Supreme Court of Missouri cited and relied upon *Schaffer v. Swenson* (E.D.Mo.1970), 318 F.Supp. 51, 53[1] as stating the applicable ineffectiveness standard. On the page of the Eastern District of Missouri's opinion in *Schaffer* cited and relied upon by the Supreme Court of Missouri in *Franklin,* Chief Judge Harper quoted and applied *Cardarella's* oft-quoted rule in its traditional form in denying relief in the State prisoner habeas case before him. The Court of Appeals apparently affirmed in an unreported opinion, for *certiorari* was denied in 404 U.S. 944, 92 S.Ct. 296, 30 L.Ed.2d 259 (1971).

While the Court of Appeals' conclusion that "This Circuit continues to follow the 'mockery of justice' standard" is consistent with the line of Eighth Circuit cases cited in that opinion, it is obviously difficult to reconcile *Franklin v. State* and the line of Eighth Circuit authority cited and relied upon in that case with *Turley*

and *Garton.* Judge Nangle, of course, was reversed a very short time after *Franklin* had been decided because he concluded that the Supreme Court of Missouri had properly articulated the proper federal standard when it cited and applied *Cardarella's* "farce and mockery" rule. The federal district judges in Missouri need guidance in regard to whether they should follow *Franklin* or *Thomas.*

**19.** It is difficult to understand why the ineffectiveness rule was discussed in *Schleicher.* The Supreme Court of Missouri stated that the "sole ground" presented for post-conviction review was a Fourth Amendment question. See 483 S.W.2d 393 (Mo. en banc 1972). The nature of that question is reflected by the following statement in Judge, now Chief Justice, Seiler's dissenting opinion: "The basic question is, who is going to hear federal constitutional search and seizure questions arising from Missouri state convictions? Our divisional posi-

which the Supreme Court of Missouri articulated the traditional "farce and mockery" rule in reliance upon its own cases and upon *Cardarella,* the Court of Appeals read *Franklin v. Wyrick, DeBerry v. Wolff,* and *Johnson v. United States* as holding that "a defendant must establish that his representation was so ineffective as to constitute a mockery of justice, shocking to the conscience." That was precisely the way Judge Nangle read two of those same cases, but he was reversed for his efforts in *Thomas v. Wyrick* a few short weeks later.

*Nick v. United States,* 8 Cir., 531 F.2d 936, decided March 18, 1976, was a per curiam opinion which affirmed the denial of a Section 2255 motion apparently based on two grounds. Petitioner's claim that "his attorney failed to adequately investigate the case and failed to subpoena witnesses to corroborate his version of events," a claim very close to that made in *Garton,* was summarily disposed of with the statement that the movant "has not brought this case within the holding in *McQueen v. Swenson,* 498 F.2d 207 (8th Cir. 1974)." It is not clear what the movant's second ground in *Nick* may have been (the opinion stated only that "appellant's further contention that his counsel's trial performance was inept is without merit"), but whatever that claim might have been, *Nick* concluded that the Section 2255 motion was properly ruled without the necessity of any evidentiary hearing.

We respectfully suggest that the slip opinions to which we have made reference and the earlier post-*McQueen* cases cited and relied upon in those slip opinions, including *Thomas,* the Eighth Circuit's most recent opinion, must be said to support Judge Henley's observation in *Thomas* that at least some panels of the Eighth Circuit do not read *McQueen* as reflecting any substantial departure from the traditional Eighth Circuit "farce and mockery" rule.

If that be true, we believe that it can be fairly said that other particular panels of the Eighth Circuit may in the future require application of the line of existing Eighth Circuit authority which recognize *Cardarella's* traditional "farce and mockery" rule as the exclusive rule of this circuit. Such action would merely reflect a return to the express holding of *Turley.* A return to *Turley* would not be at all difficult because it must be remembered that *Turley,* although not even mentioned in *Garton,* and although never cited in any post-*McQueen* Eighth Circuit case, is still on the books and has never been expressly overruled or even questioned by any Eighth Circuit panel.

We further believe that a fair reading of the slip opinions discussed also establishes, however, that particular panels of the Eighth Circuit may read *McQueen* as reflecting a substantial departure from the traditional *Cardarella* "farce and mockery" rule and that this second line of Eighth Circuit authority would require application of the *McQueen-Thomas* "flexible" ad hoc application of *Cardarella,* which must be said to co-exist with the traditional *Cardarella* rule.

The majority opinions in both *Garza* and *Thomas* apparently recognized that if the traditional *Cardarella* rule articulated by the respective State Supreme Courts involved was properly applicable as a federal standard to the factual circumstances presented in those cases, federal habeas corpus relief would have routinely and properly been denied by the federal district court. It apparently was only by application of the co-existing and conflicting line of *McQueen-Thomas* Eighth Circuit authority that a different result was reached in those cases.

We turn now to other post-*McQueen* cases which indicate that other lines of authority presently exist in the Eighth Circuit

tion is that it is to be done by the federal courts, *Fields v. State* (Mo.Sup.) 468 S.W.2d 31. This leads to conflicts and does not promote finality. If there is a defect in our state proceedings, it seems to me we should handle it,

rather than turning it over to the federal courts." [483 S.W.2d at 395]

The Supreme Court of Missouri answered that question in favor of federal court jurisdiction.

which afford State court judges and federal district judges still additional alternatives in their determination of a Sixth Amendment ineffectiveness case and which, in our judgment, reflect the need for guidance from the Eighth Circuit en banc.

## V.

In this part of this appendix we shall discuss what may be viewed as two additional lines of co-existing Eighth Circuit authority concerning which definitive guidance is needed from the Eighth Circuit en banc.

We suggest that *Smith v. Wolff* (8th Cir. 1974), 506 F.2d 556, may be considered as an example of an Eighth Circuit case which viewed *McQueen* as but a part of the traditional common law process under which applicable rules of law are being subjected to reconsideration and change in light of the contributions made by other courts. In that case, the petitioner claimed among other things that "counsel failed to investigate properly either the law or the facts of his case." In remanding the district court's dismissal of the federal habeas proceeding, it was stated that "the standard of competency" set forth in *McQueen* and *Garton* "will provide guidance for this inquiry." The district court was directed "to consider the competency of counsel in its entirety." The "range of competency" language of both *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), and *Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), as apparently discussed by the district court, was expressly approved by the Court of Appeals, the Court stating that "the District Court properly held that the disposition of this issue is controlled by *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)." That conclusion, of course, is a considerable step beyond what *McQueen* said in regard to the impact of Supreme Court decisions on the Sixth Amendment standard in general, and the impact of *McMann v. Richardson,* on such a standard, in particular.

The most recent Supreme Court discussion of *McMann* is in *Henderson v. Morgan,* —— U.S. ——, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976). See 44 Law Week 4910. That case affirmed the grant of federal habeas relief to a State prisoner whose 1965 guilty plea to the unexplained charge of second-degree murder was found to be involuntary. While the question of Sixth Amendment standards was not in precise focus, that question, however, is implicitly involved and in the closely related context of what advice must be given a defendant in order to establish the voluntariness of his guilty pleas, both Mr. Justice White, in his concurring opinion, and Mr. Justice Rehnquist, in his dissenting opinion, discussed *McMann.* Mr. Justice White quoted *McMann's* holding that a defendant's conviction on plea of guilty must be based upon his "counseled admission in open court." Mr. Justice White's opinion, incidentally, concludes that it is "too late in the day" to consider the failure properly to advise a defendant of the consequences of his guilty plea as "harmless error."

Mr. Justice Rehnquist, joined by the Chief Justice, said in his dissenting opinion that the question of whether a defendant was "properly advised" when he entered his guilty plea "depends upon the sort of advice reasonably competent counsel would have been expected to give him, see *Brady v. United States,* 397 U.S. 742, 756–757, 90 S.Ct. 1463, 1473, 25 L.Ed.2d 747 (1970), and *McMann v. Richardson,* 397 U.S. 759, 770, 90 S.Ct. 1441, 1448, 25 L.Ed.2d 763 (1970)." He added that "Thus the test to be applied is . . . based on the practices of reasonably competent attorneys experienced in the day-to-day business of representing criminal defendants in a trial court."

It would seem to be apparent that *Smith v. Wolff's* discussion of a "standard of competency" and its express approval of the district court's reading of the Supreme Court's decision in *McMann* is most consistent with how both Mr. Justice White, with whom Mr. Justice Stewart, Mr. Justice Blackmun, and Mr. Justice Powell joined,

and Mr. Justice Rehnquist, with whom the Chief Justice joined, read that case.[20]

In *Wolfs v. Britton* (8th Cir. 1975), 509 F.2d 304, the Court of Appeals was again presented with a Sixth Amendment question which the Western District of Missouri, en banc, sent to the Court of Appeals in 1969 but which the Eighth Circuit found unnecessary to reach.[21] The Court of Appeals concluded in that case, again well beyond the rationale adopted by *McQueen*, that proper consideration of the problem of ineffective representation must "start with the seminal decision in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)." *McQueen* was cited as an example of a case in which appropriate Sixth Amendment standards were in the process of being developed. *Wolfs v. Britton* suggested that in *McQueen* the Court of Appeals "drew support from those cases which have outlined specific standards of minimally effective preparation and investigation," citing the leading case of *United States v. DeCoster* (rather than *Bruce*, as did *McQueen*) in the District of Columbia and the leading case of *Coles v. Peyton* (4th Cir. 1968), 389 F.2d 224, *cert. denied* 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968) from the Fourth Circuit. That case also noted that *McQueen* had quoted and apparently relied upon the American Bar Association Standards Relating to the Prosecution Function and the Defense Function § 4.1

*Crismon v. United States* (8th Cir. 1975), 510 F.2d 356, 358, which we have already noted, did not cite or mention the *Cardarella* "farce and mockery" rule. Citing only *McQueen* and *Garton*, the district court's denial of federal habeas was affirmed because the record established that trial counsel had in fact "exercised the customary

skill and diligence of a reasonably competent criminal attorney in the assistance he rendered." The refusal of the Court of Appeals to affirm the rationale of the district court, which was based upon *Cardarella* (see *Crismon v. United States* (E.D.Mo. 1974), 374 F.Supp. 438 at 441), however, might be viewed at least by some judges, as a refusal to perpetuate the Eighth Circuit's traditional "farce and mockery" rule as articulated in *Cardarella*. Such a view may be supported by the Court of Appeals' statement in that case that "there exists no magic formula for reviewing claims of ineffective assistance of counsel." The *Cardarella* rule, in its traditional form, must certainly be considered as a "magic formula." For all cases in which that rule has been enunciated and applied in its traditional form have rationalized their denial of an ineffectiveness claim on an automatic application of the rule.

It may be somewhat difficult to put *Crismon* in any particular line of existing Eighth Circuit authority. For the "no magic formula" language sounds a great deal like *Garton's* and McQueen's admonition that State court judges and federal district court judges in the Eighth Circuit are not to read *Cardarella's* "farce and mockery" rule too "literally." On the other hand, *Crismon* comes very close to stating a standard: "customary skill and diligence of a reasonably competent criminal attorney"— which other Circuits have adopted as the applicable Sixth Amendment standard.

Although *Crismon* apparently suggests, without saying so expressly, that due process considerations are still applicable to a Sixth Amendment ineffectiveness case, it would appear that *Crismon* clearly is closer

---

20. Mr. Justice Stevens, who wrote the opinion of the Court in a manner satisfactory to Mr. Justice Brennan and Mr. Justice Marshall, apparently did not believe that the question needed elaborate discussion in light of the District Court's finding that while "the lawyers gave respondent advice about the different sentences which could be imposed . . . [they] did not explain the required element of intent."

21. See *Pedicord v. Swenson* (W.D.Mo. en banc 1969), 304 F.Supp. 393, and *Pedicord v. Swenson* (8th Cir. 1970), 431 F.2d 92, in which this Court was affirmed in granting habeas relief on its finding that the guilty plea was involuntary, but in which the Court of Appeals refused to reach the alternate ground for granting habeas relief based on counsel's failure to meet the standards for assistance of counsel as developed in parts III, IV and V of the district court opinion.

726

to the *Smith v. Wolff* and *Wolfs v. Britton* line of authority than to either of the co-existing lines of authority which reflect the traditional *Cardarella* rule or the *Cardarella* rule as it may have been modified by *McQueen* and possibly *Thomas.* It may be that *Crismon* belongs in still another separate developing line of Eighth Circuit authority.

Except for the definitive footnote statement to which we have made reference, *Johnson v. United States* (8th Cir. 1974), 506 F.2d 640, 646, would obviously belong in the same line of authority as *Crismon.* For that case, as did *Crismon,* clearly indicated at least a degree of unhappiness with *McQueen, Garton,* and *Robinson. Johnson* stated that those cases "may suggest a standard not supported by constitutional principles." In addition, *Johnson* suggested that "a more appropriate nomenclature for the standard would be to test for the degree of competence prevailing among those licensed to practice before the bar." 506 F.2d at 646. That statement is quite close to the rationale stated in *Smith v. Wolff,* as well as in *Crismon.*

There are three other Eighth Circuit cases which could be said to belong in one of the developing lines of Eighth Circuit authority under discussion. Those cases could be said to reflect that the Court of Appeals apparently gave consideration to the careful work of the district judge's decision under review. Both of the district court opinions involved viewed *McQueen* as a forecast of a final rejection of *Cardarella* and expressly refused to articulate and apply the traditional "farce and mockery" rule. Both district courts were affirmed. We believe that those cases, like *Johnson* and *Crismon,* are much closer to the developing lines of authority discussed in this part of this appendix than to either the traditional *Cardarella* line of authority or the coexisting *McQueen-Thomas* line of authority which we have discussed earlier.

*Clark v. Lockhart* (8th Cir. 1975), 512 F.2d 235, affirmed then Chief Judge Henley's denial of federal habeas relief by stating that "we reject Clark's first contention

for the reasons enunciated by Chief Judge Henley in his memorandum opinion filed in the district court July 29, 1974." Chief Judge Henley's July 29, 1974 opinion is reported at 379 F.Supp. 1320. Chief Judge Henley's reading of *McQueen* was thus expressly approved by the Court of Appeals. Chief Judge Henley stated:

In *McQueen, supra,* the Court of Appeals indicated dissatisfaction with the rule that the effectiveness and adequacy of the assistance afforded to his client by an attorney is to be measured by the "mockery of justice" test laid down in earlier cases and strongly indicated preference for the rule that has been adopted in other Circuits that the quality of the representation afforded is to be measured by a reasonable or normal competency yardstick. While the Court of Appeals did not find it necessary in the particular case before it to reject categorically the earlier rule, this Court thinks it fairly predictable that in the future the adequacy and effectiveness of representation will be measured by reference to the questions of whether the attorney was reasonably competent and whether his representation of his client in the particular case was reasonably competent. And this Court will measure the representation afforded petitioner by Mr. Wilkinson by those standards. [379 F.Supp. at 1329]

In *Kelton v. United States* (W.D.Mo. 1975), 394 F.Supp. 173, Chief Judge Becker stated in a similar manner that a Section 2255 movant's claim of ineffective assistance of counsel there presented would not be judged by "the traditional farce and 'mockery of justice' standards previously followed in this Circuit." He concluded that "movant's final contention is considered and determined under the more recent standards set forth in *Garton v. Swenson,* 497 F.2d 1137 (8th Cir. 1974) and *McQueen v. Swenson,* 498 F.2d 207 (8th Cir. 1974)." The Court of Appeals affirmed, 518 F.2d 531, 534, without mention of *Cardarella* or any other "farce and mockery" rule, quoting only the "no magic formula" language from *Crismon.* In like manner *Wil-*

liams v. United States (8th Cir. 1975), 521 F.2d 590, 591, cited only McQueen in affirming the District Court's denial of a § 2255 motion on the ground that the movant had not established that he had in fact been denied the effective assistance of counsel.

We respectfully suggest that the cases discussed in this part of the appendix indicate that there are at least two or more developing lines of Eighth Circuit authority which can exist, side by side, with the traditional Cardarella rule and the not so clearly defined McQueen-Thomas line of authority. We further respectfully suggest that the cases discussed in this part of the appendix, together with the cases from the Supreme Court and from other circuits which are cited in those cases, afford a sound basis for the development of an appropriate Sixth Amendment standard by the Eighth Circuit en banc which may effectively eliminate the difficulties which State court judges and federal district court judges in this circuit will continue to face until and unless they receive more definite guidance from the Court of Appeals en banc.[22]

### VI.

It was in 1932 that Powell v. Alabama concluded that the duty to assign counsel "is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case" and that one charged with a crime "requires the guiding hand of counsel at every step in the proceedings against him. [For] without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence."

It was forty years later that the Supreme Court, without dissent, decided Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). That case, of course, extended the Sixth Amendment's guarantee of the effective assistance of counsel to all cases, whether felony or misdemeanor, if the consequence of conviction involved a custodial sentence. In reliance upon Powell v. Alabama, the Court held that "the Sixth Amendment . . . extended the right to counsel beyond its common-law dimensions" Id. at 30, 92 S.Ct. at 2009. The Court reiterated, as it has throughout all of our history as a federal Union, that "we do not sit as an ombudsman to direct state courts how to manage their affairs but only to make clear the federal constitutional requirement." Id. at 38, 92 S.Ct. at 2013. All States in the Union were thus advised that:

> Under the rule we announce today, every judge will know when the trial of a misdemeanor starts that no imprisonment may be imposed, even though local law permits it, unless the accused is represented by counsel. . . . The run of misdemeanors will not be affected by today's ruling. But in those that end up in the actual deprivation of a person's liberty, the accused will receive the benefit of "the guiding hand of counsel" so necessary when one's liberty is in jeopardy. [407 U.S. at 40, 92 S.Ct. at 2014]

In his opinion concurring in result, Mr. Chief Justice Burger indicated that he fully recognized the impact of Argersinger's holding on the administration of criminal justice in the various States. But he said that:

> The step we take today should cause no surprise to the legal profession. More than five years ago the profession, speak-

**22.** The recent case of United States v. MacCollom, —— U.S. ——, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976), [44 Law Week 4813], which ruled the question of when a § 2255 movant was entitled to a free transcript, underlines the fact that a Sixth Amendment ineffectiveness of counsel question must be anticipated in most federal post-conviction cases. Indeed, one of the post-conviction claims in that case was such a claim.

Mr. Justice Stevens' dissenting opinion outlined the type of factual questions most frequently presented in a typical Sixth Amendment ineffectiveness case in footnote 4, page ——, page 2097 of 96 S.Ct. None of the four separate opinions in MacCollom remotely suggested that those questions could be answered by the application of a "farce or mockery" or any other form of due process rule. All opinions assumed that Sixth Amendment standards were applicable.

ing through the American Bar Association in a Report on Standards Relating to Providing Defense Services, determined that society's goal should be "that the *system* for providing counsel and facilities for the defense be as good as the system which society provides for the prosecution." [*Id.* at 43, 92 S.Ct. at 2015] (Emphasis the Court's and ours).

Mr. Chief Justice Burger made specific reference to another ABA Standard which has .been frequently cited and applied by circuits which have concluded that Sixth Amendment , standards, rather than due process considerations of fairness, must be applied in all ineffectiveness cases, by stating:

> In a companion ABA Report on Standards Relating to the Prosecution Function and the Defense Function the same basic theme appears in the positive standard cast in these terms:
>
>> "Counsel for the accused is an essential component of the administration of criminal justice. A court properly constituted to hear a criminal case must be viewed as a tripartite entity consisting of the judge (and jury, where appropriate), counsel for the prosecution, and counsel for the accused." *Id.,* at 153 (Approved Draft 1968).

And in the final paragraph of his opinion in *Argersinger,* Mr. Chief Justice Burger concluded:

> The right to counsel has historically been an evolving concept. The constitutional requirements with respect to the issue have dated in recent times from *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), to *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). . . . The holding of the Court today may well add large new burdens on a profession already overtaxed, but the dynamics of the profession have a way of rising to the burdens placed on it. [*Id.* at 44, 92 S.Ct. at 2015]

We respectfully suggest one cannot study the Supreme Court and lower federal court cases decided in the forty year interval between *Powell v. Alabama* and *Argersinger v. Hamlin* without coming to an understanding that the evolution of appropriate Sixth Amendment standards has proved to be an extremely difficult task. That difficulty has been increased by obvious collateral pressures and considerations which reflect the need to give proper weight to concepts of finality of criminal convictions, avoidance of the use of hindsight, and general considerations of fairness to counsel who have in fact properly discharged their duty to their client.

Regardless of the reasons for difficulty, it is clear, we believe, that Judge Henley was eminently correct when he suggested in his *Thomas* dissent that the Eighth Circuit should reconsider the various current rules of decision which presently exist in this Circuit and that a proper and adequate Sixth Amendment standard be stated in order that the district judges have some assurance as to how their decisions will be reviewed and in order that the Circuit judges may exercise their "proper appellate function in reviewing decisions of the district court in cases in which they have been called upon to apply that standard."

We are also, of course, in complete agreement with Judge Henley's additional suggestion that "it behooves the district courts to make it clear in their findings or opinions that they have considered the question before them in the light of the prescribed standard." Our experience in this difficult area of the law establishes that federal district court review of a State prisoner habeas Sixth Amendment ineffectiveness claim is most frequently rendered more difficult than should be necessary by the failure of Missouri appellate courts to insist upon the full plenary evidentiary hearing contemplated and required by Missouri Rule 27.26 and State trial court compliance with that rule, which also requires the statement of detailed findings of fact and conclusions of law.[23]

---

**23.** We suggested in Part III of our second opinion in this case, see 367 F.Supp. at 1357–1359, that the manner in which the State courts, both trial and appellate, dealt with petitioner's Sixth

We believe that it is implicit in Judge Henley's suggestion that the proper course for the Court of Appeals to follow, in cases in which a federal district judge has failed to state detailed findings of fact and has failed to make appropriate conclusions of law which make clear that he has properly considered the Sixth Amendment question before him in light of the prescribed Sixth Amendment standard, would be for the Court of Appeals to remand the case to the district court for supplemental proceedings, before further appellate consideration on the merits.[24]

When this Court was required in 1966 in *Donnell v. Swenson* (W.D.Mo.1966), 258 F.Supp. 317, affirmed (8th Cir. 1967), 382 F.2d 248, to determine whether the principles relating to the assistance of counsel on appeal enunciated in *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), were to be retroactively applied to all State prisoners who had been denied counsel on appeal in Missouri, there were dire predictions in regard to the burden that would be imposed if that question was answered in the affirmative. This Court, however, was convinced that the constitutional question presented had to be ruled in the affirmative. In recognition of the importance of the question presented and its impact on every State in the Circuit, the Court of Appeals, on its own motion, immediately assigned the case for determination by the Court en banc. The Supreme Court

---

Amendment claim, in addition to forcing this Court to conduct an additional post-conviction hearing, complicated the processing of this case through the federal judicial system. In *Pedicord v. Swenson,* we noted that the same thing was true. See 304 F.Supp. at 394.

**24.** See *State v. Stidham* (Mo. en banc 1967) 415 S.W.2d 297, in which Chief Justice Storckman stated the proper appellate procedure for a Missouri appellate court to follow in the event a State trial judge failed to hold a required evidentiary hearing or failed to state findings of fact and conclusions of law as required by Missouri's then recently amended Rule 27.26. Chief Justice Storckman stated that "The amended rule was adopted after considerable study and is intended to provide a post-conviction procedure in accord with the principles enunciated in the so-called trilogy of *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148, *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, and *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770. Further in keeping with the teachings of the trilogy, the amended rule is designed to discover and adjudicate all claims for relief in one application and avoid successive motions."

After noting the failure of the State trial judge to comply with amended Rule 27.26, the case was immediately remanded to the State trial court, which was directed to conduct "all further proceedings . . . in compliance with the provisions of amended Rule 27.26." *Id.* at 298. In order to avoid a second failure, the Supreme Court of Missouri, en banc, stated that "The trial court . . . is required to conduct a full evidentiary hearing . . . after which the court then is to decide all issues of fact and questions of law, making findings of fact and conclusions of law as required by subparagraph (i) of amended S.Ct. Rule 27.26."

In further regard to the post-conviction tools with which Missouri courts have to work, see our very first *Garton* opinion, written in 1967. In that case, reported as *Garton v. Swenson* (W.D.Mo.1967), 266 F.Supp. 726, 731, we refused to exercise federal habeas jurisdiction in light of Missouri's then recently amended Rule 27.26 and concluded our opinion in that case by stating "Missouri now has the best postconviction procedure in the Nation. We believe comity requires that the courts of Missouri should, under the narrow factual circumstances presented on the facts of this case, be permitted to use that procedure to the end that the courts that have primary responsibility for the administration of criminal justice in Missouri be given a further opportunity to rule petitioner's postconviction federal claims on their merits after a full and fair evidentiary hearing."

Missouri appellate courts frequently encounter difficulties in their post-conviction review of federal constitutional questions, all of which are eventually transferred to the federal judicial system by honoring the salutary appellate procedural rule stated in *Stidham,* by its breach. We do not, however, believe that should the Eighth Circuit en banc adopt an appellate procedural rule similar in substance to that stated by the Supreme Court of Missouri in *Stidham,* that the Eighth Circuit would deal as leniently with failures of the federal district judges in this Circuit as Missouri appellate courts have dealt with the failures of State trial courts. We believe that the rule would be vigorously enforced by the Eighth Circuit, if for no other reason than for the obvious conservation of the appellate judicial time required in most Sixth Amendment ineffectiveness cases in which any rule other than the traditional *Cardarella* rule is given consideration.

of Missouri accepted the Eighth Circuit's carefully considered en banc decision and immediately adopted appropriate procedures to comply with that decision. Fears of disruption of federal-State comity never materialized. The Supremacy Clause of the Constitution was recognized and applied by both judicial systems.

We respectfully suggest that the assignment of the assistance of counsel question presented in *Donnell* to the Court en banc established an appropriate precedent for the like assignment of the next Sixth Amendment ineffective assistance of counsel case to be considered by the Court of Appeals in this Circuit. We further respectfully suggest that the enunciation of a single definitive Sixth Amendment effectiveness standard by the Eighth Circuit will save untold hours of judicial time of all judges, both State and federal, trial and appellate, who are required to deal with such cases in ever increasing numbers. As we have indicated, we do not believe that the principles enunciated in the Supreme Court's habeas trilogy can be effectively applied unless appellate courts, both federal and State, insist that the trial judges of both systems conduct appropriate evidentiary hearings, when necessary, and unless trial judges are required to reliably find the facts and clearly state their conclusions of law for appropriate appellate consideration.

If we are wrong in our judgment that no real additional burden would be imposed by the suggested action, then we state our complete agreement with Mr. Chief Justice Burger's expression of confidence in *Argersinger* that "the dynamics of the profession have a way of rising to the burdens placed on it." [407 U.S. at 44, 92 S.Ct. at 2015]. In any event, the State court judges and the federal district judges in the Eighth Circuit will at long last be definitively advised in regard to what federal standard and what trial and appellate court procedures are to be applied in determining whether a particular convicted person has in fact, and in law, received the benefit of the "guiding hand of counsel," as guaranteed by the Sixth Amendment to the Constitution of the United States.

We close this appendix by again respectfully indicating our considered agreement with the suggestion made by Judge Henley in his *Thomas* dissent that such guidance is presently lacking but urgently needed.